James L. DRONENBURG, Appellant,

v.

Vice Admiral Lando ZECH, Chief of Naval Personnel, et al.

No. 82–2304.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 29, 1983.

Decided Aug. 17, 1984.

Rehearing En Banc Denied Nov. 15, 1984.

Stephen V. Bomse, San Francisco, Cal., with whom Steven M. Block, Leonard Graff, San Francisco, Cal., and Calvin Steinmetz, Washington, D.C., were on the brief, for appellant.

William G. Cole, Atty., Dept. of Justice, Washington, D.C., of the Bar of the District of Columbia Court of Appeals, pro hac vice by special leave of the Court, with whom J. Paul McGrath, Asst. Atty. Gen., Anthony J. Steinmeyer, Richard A. Olderman, Attys., Dept. of Justice and Stanley S. Harris, U.S. Atty., Washington, D.C. (at the time the brief was filed), were on the brief, for appellees. Marc Johnston, Atty., Dept. of Justice, Washington, D.C., also entered an appearance for appellees.

Charles Lister and Arthur B. Spitzer, Washington, D.C., were on the brief, for amicus curiae urging remand.

Before BORK and SCALIA, Circuit Judges, and WILLIAMS,* Senior District Judge, United States District Court for the Central District of California.

BORK, Circuit Judge:

James L. Dronenburg appeals from a district court decision upholding the United States Navy's action administratively discharging him for homosexual conduct. Appellant contends that the Navy's policy of

* Sitting by designation pursuant to 28 U.S.C.   § 294(d).

mandatory discharge for homosexual conduct violates his constitutional rights to privacy and equal protection of the laws. The district court granted summary judgment for the Navy, holding that private, consensual, homosexual conduct is not constitutionally protected. We affirm.

### I.

On April 21, 1981, the United States Navy discharged James L. Dronenburg for homosexual conduct. For the previous nine years he had served in the Navy as a Korean linguist and cryptographer with a top-security clearance. During that time he maintained an unblemished service record and earned many citations praising his job performance. At the time of his discharge Dronenburg, then a 27-year-old petty officer, was enrolled as a student in the Defense Language Institute in Monterey, California.

The Navy's investigation of Dronenburg began eight months prior to the discharge, in August, 1980, when a 19-year-old seaman recruit and student of the Language Institute made sworn statements implicating Dronenburg in repeated homosexual acts. The appellant, after initially denying these allegations, subsequently admitted that he was a homosexual and that he had repeatedly engaged in homosexual conduct in a barracks on the Navy base. On September 18, 1980, the Navy gave Dronenburg formal notice that it was considering administratively discharging him for misconduct due to homosexual acts, a violation of SEC/NAV Instruction 1900.9C (Jan. 20, 1978); Joint Appendix ("J.A.") at 216, which provided in pertinent part, that

[a]ny member [of the Navy] who solicits, attempts or engages in homosexual acts shall normally be separated from the naval service. The presence of such a member in a military environment seriously impairs combat readiness, efficiency, security and morale.[1]

On January 20 and 22, 1981, at a hearing before a Navy Administrative Discharge Board ("Board") Dronenburg testified at length in his own behalf, with counsel representing him. He again acknowledged engaging in homosexual acts in a Navy barracks.

The Board voted unanimously to recommend Dronenburg's discharge for misconduct due to homosexual acts. Two members of the Board voted that the discharge be characterized as a general one, while the third member voted that the discharge be an honorable one. The Secretary of the Navy, reviewing this case at appellant's request, affirmed the discharge but ordered that it be characterized as honorable. On April 20, 1981, the appellant filed suit in district court challenging the Navy's policy mandating discharge of all homosexuals. The district court granted summary judgment for the Navy.

### II.

As a threshold matter, we must dispose of appellees' contention that the district court lacked subject matter jurisdiction over this action. According to appellees, the doctrine of sovereign immunity precludes the bringing of this action except insofar as the Tucker Act permits damage suits in the Claims Court. Brief for Feder-

---

1. Discharge for homosexual conduct was not invariably mandatory. Instruction 1900.9C ¶ 6b (Jan. 20, 1978) provides that:

> A member who has solicited, attempted, or engaged in a homosexual act on a single occasion and who does not profess or demonstrate proclivity to repeat such an act may be considered for retention in the light of all relevant circumstances. Retention is to be permitted only if the aforesaid conduct is not likely to present any adverse impact either upon the member's continued performance of military duties or upon the readiness, efficiency, or morale of the unit to which the member

is assigned either at the time of the conduct or at the time of processing according to the alternatives set forth herein.

J.A. at 218. Moreover, the Secretary of the Navy retained the power to keep a person in service despite homosexual conduct on an ad hoc basis for reasons of military necessity.

These regulations have since been replaced by SEC/NAV Instruction 1900.9D (Mar. 12, 1981) which implements a Department of Defense Directive. J.A. at 219. The policy of 1900.9C, under which appellant was discharged, is continued in effect by 1900.9D.

al Appellees at 11–16. Appellees reason that the appellant's action is essentially one for damages; specifically, back pay against the government. The Claims Court, appellees allege, has exclusive jurisdiction over such actions where, as here, the amount is in excess of $10,000. In the alternative, appellees claim, appellant may waive the damages to the extent they exceed $10,000 and bring the suit in the district where Dronenburg resides, the Northern District of California. Brief for Federal Appellees at 15.

This circuit has held in a case remarkably similar to this one that the federal courts have jurisdiction to determine the legality and constitutionality of a military discharge. *Matlovich v. Secretary of the Air Force*, 591 F.2d 852, 859 (D.C.Cir.1978). Matlovich, like the appellant here, challenged the Air Force's decision to discharge him based upon his homosexual activities. In vacating and remanding the determination to the district court, this court relied upon the "power and the duty [of the federal courts] to inquire whether a military discharge was properly issued under the Constitution, statutes, and regulations." 591 F.2d at 859, *citing Harmon v. Brucker*, 355 U.S. 579, 78 S.Ct. 433, 2 L.Ed.2d 503 (1958); *Van Bourg v. Nitze*, 388 F.2d 557, 563 (D.C.Cir.1967); *Hodges v. Callaway*, 499 F.2d 417, 423 (5th Cir.1974). We are bound by that prior determination and therefore are not free to refuse to hear this case on jurisdictional grounds.

We are further bound by another decision of this court holding that "the United States and its officers ... are [not] insulated from suit for injunctive relief by the doctrine of sovereign immunity." *Schnapper v. Foley*, 667 F.2d 102, 107 (D.C.Cir. 1981), *cert. denied*, 455 U.S. 948, 102 S.Ct. 1448, 71 L.Ed.2d 661 (1982). *See also Sea-Land Service, Inc. v. Alaska R.R.*, 659 F.2d 243, 244 (D.C.Cir.1981). In *Schnapper*, the complainants alleged that certain officials of the Administrative Office of the United States Courts and the Register of Copyrights violated, among other things, various provisions of the Constitution, the old Copyright Acts, 17 U.S.C. § 105 (1976) and 17 U.S.C. § 8 (1970), and portions of the Communications and Public Broadcasting Acts. 667 F.2d at 106. The complaint sought injunctive and declaratory relief, as does the complaint here.[2] In finding that the District Court for the District of Columbia did in fact have jurisdiction, the court held that 5 U.S.C. § 702 was intended to waive the sovereign immunity of the United States in suits for injunctive relief. That section provides, in part, that

> [a]n action in a court of the United States seeking relief other that [sic] money damages and stating a claim that an agency or an employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief thereon denied on the ground that it is against the United States ....

5 U.S.C. § 702 (1982). In discussing the legislative history of this section, the court said:

> The legislative history of this provision could not be more lucid. It states that this language was intended "to eliminate the defense of sovereign immunity with respect to any action in a court of the United States seeking relief other than money damages and based on the assertion of unlawful official action by a federal official ...." S.Rep. No. 996, 94th Cong., 2d Sess. at 2 (1976).

*Schnapper*, 667 F.2d at 108. The court also noted that the Senate Report had expressly stated that "the time [has] now come to eliminate the sovereign immunity defense in all equitable actions for specific relief against a Federal agency or officer acting in an official capacity." *Id., quoting* S.Rep. No. 996, 94th Cong., 2d Sess. 7–8 (1976). The *Schnapper* court concluded by stating its belief that "section 702 retains the defense of sovereign immunity only

---

**2.** In his amended complaint, appellant eliminated any damages claim. Reply Brief of Appellant at 6 n. 6. Specifically, appellant seeks to have this court enjoin the Navy from discharging him and order his reinstatement. Complaint at 12; J.A. at 12.

when another statute expressly or implicitly forecloses injunctive relief." *Id.* Because no such statute has been pointed to by the appellees here, we are bound to take jurisdiction over this case.[3]

## III.

Appellant advances two constitutional arguments, a right of privacy and a right to equal protection of the laws. Resolution of the second argument is to some extent dependent upon that of the first. Whether the appellant's asserted constitutional right to privacy is based upon fundamental human rights, substantive due process, the ninth amendment or emanations from the Bill of Rights, if no such right exists, then appellant's right to equal protection is not infringed unless the Navy's policy is not rationally related to a permissible end. *Kelley v. Johnson,* 425 U.S. 238, 247–49, 96 S.Ct. 1440, 1445–47, 47 L.Ed.2d 708 (1976). We think neither right has been violated by the Navy.

## A.

According to appellant, *Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965), and the cases that came after it, such as *Loving v. Virginia,* 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967); *Eisenstadt v. Baird,* 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972); *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); and *Carey v. Population Services International,* 431 U.S. 678, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977), have "developed a right of privacy of constitu-

tional dimension." Appellant's Opening Brief on Appeal at 14–15. Appellant finds in these cases "a thread of principle: that the government should not interfere with an individual's freedom to control intimate personal decisions regarding his or her own body" except by the least restrictive means available and in the presence of a compelling state interest. *Id.* at 15. Given this principle, he urges, private consensual homosexual activity must be held to fall within the zone of constitutionally protected privacy. *Id.*

■ Whatever thread of principle may be discerned in the right-of-privacy cases, we do not think it is the one discerned by appellant. Certainly the Supreme Court has never defined the right so broadly as to encompass homosexual conduct. Various opinions have expressly disclaimed any such sweep, *see, e.g., Poe v. Ullman,* 367 U.S. 497, 553, 81 S.Ct. 1752, 1782, 6 L.Ed.2d 989 (1961) (Harlan, J., dissenting from a decision that the controversy was not yet justiciable and expressing views on the merits later substantially adopted in *Griswold* ). More to the point, the Court in *Doe v. Commonwealth's Attorney for Richmond,* 425 U.S. 901, 96 S.Ct. 1489, 47 L.Ed.2d 751 (1976), summarily affirmed a district court judgment, 403 F.Supp. 1199 (E.D.Va.1975), upholding a Virginia statute making it a criminal offense to engage in private consensual homosexual conduct. The district court in *Doe* had found that the right to privacy did not extend to private

---

**3.** We note that there has been some disagreement on the question whether 5 U.S.C. § 702 (1982) does in fact waive sovereign immunity in suits under 28 U.S.C. § 1331 (1982). The Second Circuit first held, as an alternative ground for a correct decision, that the 1976 amendments to § 702 "did not remove the defense of sovereign immunity in actions under [28 U.S.C.] § 1331." *Estate of Watson v. Blumenthal,* 586 F.2d 925, 932 (2d Cir.1978). Later, however, another of that circuit's panels, one which included within it the author of the opinion in *Watson,* disagreed with that determination, *B.K. Instrument, Inc. v. United States,* 715 F.2d 713, 724 (2d Cir.1983), as have the Third, Fifth, Sixth and Ninth Circuits. *Jaffee v. United States,* 592 F.2d 712, 718–19 (3d Cir.), *cert. denied,* 441 U.S.

961, 99 S.Ct. 2406, 60 L.Ed.2d 1066 (1979); *Sheehan v. Army & Air Force Exchange Service,* 619 F.2d 1132, 1139 (5th Cir.1980), *rev'd on other grounds,* 456 U.S. 728, 102 S.Ct. 2118, 72 L.Ed.2d 520 (1982); *Warin v. Director, Dep't of Treasury,* 672 F.2d 590, 591–92 (6th Cir.1982) (per curiam); *Beller v. Middendorf,* 632 F.2d 788, 796–97 (9th Cir.), *cert. denied,* 452 U.S. 905, 101 S.Ct. 3030, 69 L.Ed.2d 405 (1980). *See* P. Bator, P. Mishkin, D. Shapiro & H. Wechsler, *Hart & Wechsler's The Federal Courts and the Federal System* 346 (2d ed. Supp.1981) ("Since the Administrative Procedure Act does not itself confer jurisdiction, [the determination in *Watson* ] would mean, would it not, that the amendments had no effect on immunity at all?").

homosexual conduct because the latter bears no relation to marriage, procreation, or family life. 403 F.Supp. at 1200. The Supreme Court's summary disposition of a case constitutes a vote on the merits; as such, it is binding on lower federal courts. *See Hicks v. Miranda,* 422 U.S. 332, 343–45, 95 S.Ct. 2281, 2288–90, 45 L.Ed.2d 223 (1975); *Ohio ex rel. Eaton v. Price,* 360 U.S. 246, 247, 79 S.Ct. 978, 978, 3 L.Ed.2d 1200 (1959). *Cf. Port Authority Bondholders Protective Committee v. Port of New York Authority,* 387 F.2d 259, 263 n. 3 (2d Cir.1967). If a statute proscribing homosexual conduct in a civilian context is sustainable, then such a regulation is certainly sustainable in a military context. That the military has needs for discipline and good order justifying restrictions that go beyond the needs of civilian society has repeatedly been made clear by the Supreme Court. *See, e.g., Greer v. Spock,* 424 U.S. 828, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976); *Parker v. Levy,* 417 U.S. 733, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974).

It is urged upon us, however, that *Doe v. Commonwealth's Attorney* cannot be taken as an authoritative decision by the Supreme Court. The case should be viewed, it is said, as an affirmance based not on the constitutionality of the statute but rather upon plaintiffs' lack of standing. Plaintiffs were homosexuals who had not been threatened with prosecution under the statute. Indeed, those plaintiffs may have lacked standing, but the majority of the three-judge district court placed its decision squarely on the constitutionality of the statute, and the Supreme Court's summary affirmance gives no indication that the Court proceeded upon any other rationale. It would have been easy enough to affirm summarily giving a lack of standing as the reason. Under these circumstances, we doubt that a court of appeals ought to distinguish a Supreme Court precedent on the speculation that the Court might possibly have had something else in mind.

But even should we agree that *Doe v. Commonwealth's Attorney* is somewhat ambiguous precedent, we would not extend the right of privacy created by the Supreme Court to cover appellant's conduct here. An examination of the cases cited by appellant shows that they contain little guidance for lower courts. The right of privacy first achieved constitutional stature in *Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965). The *Griswold* Court began by noting that "specific guarantees in the Bill of Rights have penumbras, formed by emanations from those guarantees that help give them life and substance." 381 U.S. at 484, 85 S.Ct. at 1681. The cases cited in support of that unexceptional proposition demonstrated, for example, that a state could not force disclosure of the NAACP's membership lists because of the chilling effect upon the members' first amendment rights of assembly and political advocacy. The "penumbra" was no more than a perception that it is sometimes necessary to protect actions or associations not guaranteed by the Constitution in order to protect an activity that is. The penumbral right has no life of its own as a right independent of its relationship to a first amendment freedom. Where that relationship does not exist, the penumbral right evaporates. The Court referred to the first amendment's penumbra as a protection of "privacy," noted that other amendments created "zones of privacy," and concluded that there was a general right of privacy that lay outside the "zones" or "penumbras" of particular amendments. *Id.* It was not explained how areas not lying within any "penumbra" or "zone of privacy" became part of a more general "right of privacy," but clearly that is what the Court intended. The right of a husband and wife to use contraceptives, which the challenged Connecticut statute prohibited, was held to be guaranteed by this general right, though not by any individual amendment, penumbra, or zone. The *Griswold* opinion stressed the sanctity of marriage. It did not indicate what other activities might be protected by the new right of privacy and did not provide any guidance for reasoning about future claims laid under that right.

*Loving v. Virginia,* 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967), struck down a state antimiscegenation statute because it constituted an invidious racial classification violative of the equal protection clause of the fourteenth amendment and because it deprived appellants of liberty without due process of law in violation of the same amendment. The equal protection ruling followed from prior cases and the historical purpose of the clause. It is not entirely clear whether the due process analysis broke new ground. The Court spoke of a right of marriage but emphasized heavily the racial discrimination worked by this statute, a point central to the equal protection holding. In its brief analysis of the due process holding, the Court said only:

> The freedom to marry has long been recognized as one of the vital personal rights essential to the orderly pursuit of happiness by free men.
>
> Marriage is one of the "basic civil rights of man," fundamental to our very existence and survival. *Skinner v. Oklahoma,* 316 U.S. 535, 541 [62 S.Ct. 1110, 1113, 86 L.Ed. 1655] (1942). *See also Maynard v. Hill,* 125 U.S. 190 [8 S.Ct. 723, 31 L.Ed. 654] (1888). To deny this fundamental freedom on so unsupportable a basis as the racial classifications embodied in these statutes, classifications so directly subversive to the principle of equality at the heart of the Fourteenth Amendment, is surely to deprive all the State's citizens of liberty without due process of law. The Fourteenth Amendment requires that the freedom of choice to marry not be restricted by invidious racial discriminations. Under our Constitution, the freedom to marry, or not marry, a person of another race resides with the individual and cannot be infringed by the State.

388 U.S. at 11–12, 87 S.Ct. at 1824. There is in this passage no mode of analysis that suggests an answer to the present case, certainly none that favors appellant.

*Eisenstadt v. Baird,* 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972), invalidated under the equal protection clause of the fourteenth amendment a Massachusetts law prohibiting the distribution of contraceptives. The law in question provided that married persons could obtain contraceptives to prevent pregnancy on prescription only, single persons could not obtain contraceptives at all in order to prevent pregnancy, and married and single persons could obtain contraceptives from anyone to prevent the spread of disease. *Id.* at 442, 92 S.Ct. at 1032. The Court reasoned that there was no "ground of difference that rationally explains the different treatment accorded married and unmarried persons" under the statute. *Id.* at 447, 92 S.Ct. at 1035. The Court demonstrated that the purpose of the statute could not rationally be to deter fornication or to safeguard health. The opinion then came to the aspect presumably of most interest here: could the statute be sustained simply as a prohibition on contraception? The Court explicitly declined to decide whether such a law would conflict with "fundamental human rights" and offered instead this line of reasoning:

> If under *Griswold* the distribution of contraceptives to married persons cannot be prohibited, a ban on distribution to unmarried persons would be equally impermissible. It is true that in *Griswold* the right of privacy in question inhered in the marital relationship. Yet the marital couple is not an independent entity with a mind and heart of its own, but an association of two individuals each with a separate intellectual and emotional make-up. If the right of privacy means anything, it is the right of the *individual,* married or single, to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child.

*Id.* at 453, 92 S.Ct. at 1038 (emphasis in original). In order to apply *Eisenstadt* to a future case not involving the same personal decision, a court would have to know whether the challenged governmental regulation was "unwarranted" and whether the regulation was of a matter "so fundamentally affecting a person as the decision

whether to bear or beget a child." *Eisenstadt* itself does not provide any criteria by which either of those decisions can be made.

*Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), severely limited the states' power to regulate abortions in the name of the right of privacy. The pivotal legal discussion was as follows:

The Constitution does not explicitly mention any right of privacy. In a line of decisions, however, going back perhaps as far as *Union Pacific R. Co. v. Botsford*, 141 U.S. 250, 251 [11 S.Ct. 1000, 1001, 35 L.Ed. 734] (1891), the Court has recognized that a right of personal privacy, or a guarantee of certain areas or zones of privacy, does exist under the Constitution. In varying contexts, the Court or individual Justices have, indeed, found at least the roots of that right in the First Amendment, *Stanley v. Georgia*, 394 U.S. 557, 564 [89 S.Ct. 1243, 1247, 22 L.Ed.2d 542] (1969); in the Fourth and Fifth Amendments, *Terry v. Ohio*, 392 U.S. 1, 8–9 [88 S.Ct. 1868, 1872–1873, 20 L.Ed.2d 889] (1968), *Katz v. United States*, 389 U.S. 347, 350 [88 S.Ct. 507, 510, 19 L.Ed.2d 576] (1967), *Boyd v. United States*, 116 U.S. 616 [6 S.Ct. 524, 29 L.Ed. 746] (1886), *see Olmstead v. United States*, 277 U.S. 438, 478 [48 S.Ct. 564, 572, 72 L.Ed. 944] (1928) (Brandeis, J., dissenting); in the penumbras of the Bill of Rights, *Griswold v. Connecticut*, 381 U.S. at 484–485 [85 S.Ct. at 1681–1682]; in the Ninth Amendment, *id.*, at 486 [85 S.Ct. at 1682] (Goldberg J., concurring); or in the concept of liberty guaranteed by the first section of the Fourteenth Amendment, *see Meyer v. Nebraska*, 262 U.S. 390, 399 [43 S.Ct. 625, 626, 67 L.Ed. 1042] (1923). These decisions make it clear that only personal rights that can be deemed "fundamental" or "implicit in the concept of ordered liberty," *Palko v. Connecticut*, 302 U.S. 319, 325 [58 S.Ct. 149, 152, 82 L.Ed. 288] (1937), are included in this guarantee of personal privacy. They also make it clear that the right has some extension to activities relating to marriage, *Loving v. Virginia*, 388 U.S. 1, 12 [87 S.Ct. 1817, 1823, 18 L.Ed.2d 1010] (1967); procreation, *Skinner v. Oklahoma*, 316 U.S. 535, 541–542 [62 S.Ct. 1110, 1113–1114, 86 L.Ed. 1655] (1942); contraception, *Eisenstadt v. Baird*, 405 U.S., at 453–454 [92 S.Ct. at 1038–1039]; *id.*, at 460, 463–465 [92 S.Ct. at 1041, 1043–1044] (White, J., concurring in result); family relationships, *Prince v. Massachusetts*, 321 U.S. 158, 166 [64 S.Ct. 438, 442, 88 L.Ed. 645] (1944); and child rearing and education, *Pierce v. Society of Sisters*, 268 U.S. 510, 535 [45 S.Ct. 571, 573, 69 L.Ed. 1070] (1925), *Meyer v. Nebraska, supra.*

This right of privacy, whether it be founded in the Fourteenth Amendment's concept of personal liberty and restrictions upon state action, as we feel it is, or, as the District Court determined, in the Ninth Amendment's reservation of rights to the people, is broad enough to encompass a woman's decision whether or not to terminate her pregnancy. The detriment that the State would impose upon the pregnant woman by denying this choice altogether is apparent. Specific and direct harm medically diagnosable even in early pregnancy may be involved. Maternity, or additional offspring, may force upon the woman a distressful life and future. Psychological harm may be imminent. Mental and physical health may be taxed by child care. There is also the distress, for all concerned, associated with the unwanted child, and there is the problem of bringing a child into a family already unable, psychologically and otherwise, to care for it. In other cases, as in this one, the additional difficulties and continuing stigma of unwed motherhood may be involved. All these are factors the woman and her responsible physician necessarily will consider in consultation.

410 U.S. at 152–53, 93 S.Ct. at 726–27. The Court nevertheless refused to accept the argument that the right to abort is absolute.

The Court's decisions recognizing a right of privacy also acknowledge that some

state regulation in areas protected by that right is appropriate. As noted above, a State may properly assert important interests in safeguarding health, in maintaining medical standards, and in protecting potential life. At some point in pregnancy, these respective interests become sufficiently compelling to sustain regulation of the factors that govern the abortion decision. *The privacy right involved, therefore, cannot be said to be absolute. In fact, it is not clear to us that the claim asserted by some amici that one has an unlimited right to do with one's body as one pleases bears a close relationship to the right of privacy previously articulated in the Court's decisions.* The Court has refused to recognize an unlimited right of this kind in the past. *Jacobson v. Massachusetts,* 197 U.S. 11 [25 S.Ct. 358, 49 L.Ed. 643] (1905) (vaccination); *Buck v. Bell,* 274 U.S. 200 [47 S.Ct. 584, 71 L.Ed. 1000] (1927) (sterilization).

*Id.* at 153–54, 93 S.Ct. at 727 (emphasis added). Thus, though the Court gave an illustrative list of privacy rights, it also denied that the right was as broad as the right to do as one pleases with one's body. Aside from listing prior holdings, the Court provided no explanatory principle that informs a lower court how to reason about what is and what is not encompassed by the right of privacy.

*Carey v. Population Services International,* 431 U.S. 678, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977), held unconstitutional yet another regulation of access to contraceptives on grounds of privacy. The New York statute required that distribution of contraceptives to persons over sixteen be only by a licensed pharmacist. That provision was held unconstitutional because no compelling state interest was perceived that could overcome "the teaching of *Griswold* ... that the Constitution protects individual decisions in matters of childbearing from unjustified intrusion by the State." *Id.* at 687, 97 S.Ct. at 2017. A

compelling state interest was required "not because there is an independent fundamental 'right of access to contraceptives,' but because such access is essential to exercise of the constitutionally protected right of decision in matters of childbearing that is the underlying foundation of the holdings in *Griswold, Eisenstadt v. Baird,* and *Roe v. Wade."* *Id.* at 688–89, 97 S.Ct. at 2018. Limiting distribution to licensed pharmacists significantly burdened that right. *Id.* at 689, 97 S.Ct. at 2018.[4]

These cases, and the suggestion that we apply them to protect homosexual conduct in the Navy, pose a peculiar jurisprudential problem. When the Supreme Court decides cases under a specific provision or amendment to the Constitution it explicates the meaning and suggests the contours of a value already stated in the document or implied by the Constitution's structure and history. The lower court judge finds in the Supreme Court's reasoning about those legal materials, as well as in the materials themselves, guidance for applying the provision or amendment to a new situation. But when the Court creates new rights, as some Justices who have engaged in the process state that they have done, *see, e.g., Doe v. Bolton,* 410 U.S. 179, 221–22, 93 S.Ct. 739, 762–63, 35 L.Ed.2d 201 (1973) (White, J., dissenting); *Roe v. Wade,* 410 U.S. 113, 167–68, 93 S.Ct. 705, 733–34, 35 L.Ed.2d 147 (1973) (Stewart, J., concurring), lower courts have none of these materials available and can look only to what the Supreme Court has stated to be the principle involved.

In this group of cases, and in those cited in the quoted language from the Court's opinions, we do not find any principle articulated even approaching in breadth that which appellant seeks to have us adopt. The Court has listed as illustrative of the right of privacy such matters as activities relating to marriage, procreation, contraception, family relationships, and child rearing and education. It need hardly be

---

**4.** The Court also struck down a provision of the law forbidding distribution of contraceptives to those less than 16 years old, but there was no majority rationale for this result and it would not advance our inquiry to discuss the various opinions offered.

said that none of these covers a right to homosexual conduct.

The question then becomes whether there is a more general principle that explains these cases and is capable of extrapolation to new claims not previously decided by the Supreme Court. It is true that the principle appellant advances would explain all of these cases, but then so would many other, less sweeping principles. The most the Court has said on that topic is that only rights that are "fundamental" or "implicit in the concept of ordered liberty" are included in the right of privacy. These formulations are not particularly helpful to us, however, because they are less prescriptions of a mode of reasoning than they are conclusions about particular rights enunciated. We would find it impossible to conclude that a right to homosexual conduct is "fundamental" or "implicit in the concept of ordered liberty" unless any and all private sexual behavior falls within those categories, a conclusion we are unwilling to draw.

In dealing with a topic like this, in which we are asked to protect from regulation a form of behavior never before protected, and indeed traditionally condemned, we do well to bear in mind the concerns expressed by Justice White, dissenting in *Moore v. City of East Cleveland*, 431 U.S. 494, 544, 97 S.Ct. 1932, 1958–59, 52 L.Ed.2d 531 (1977):

> That the Court has ample precedent for the creation of new constitutional rights should not lead it to repeat the process at will. The Judiciary, including this Court, is the most vulnerable and comes nearest to illegitimacy when it deals with judge-

made constitutional law having little or no cognizable roots in the language or even the design of the Constitution. Realizing that the present construction of the Due Process Clause represents a major judicial gloss on its terms, as well as on the anticipation of the Framers, and that much of the underpinning for the broad, substantive application of the Clause disappeared in the conflict between the Executive and the Judiciary in the 1930's and 1940's, the Court should be extremely reluctant to breathe still further substantive content into the Due Process Clause so as to strike down legislation adopted by a State or city to promote its welfare. Whenever the Judiciary does so, it unavoidably pre-empts for itself another part of the governance of the country without express constitutional authority.

Whatever its application to the Supreme Court, we think this admonition should be taken very seriously by inferior federal courts. No doubt there is "ample precedent for the creation of new constitutional rights," but, as Justice White said, the creation of such rights "comes nearest to illegitimacy" when judges make "law having little or no cognizable roots in the language or even the design of the Constitution." If it is in any degree doubtful that the Supreme Court should freely create new constitutional rights,[5] we think it certain that lower courts should not do so. We have no guidance from the Constitution or, as we have shown with respect to the case at hand, from articulated Supreme Court principle. If courts of appeals should, in such

---

**5.** It may be only candid to say at this point that the author of this opinion, when in academic life, expressed the view that no court should create new constitutional rights; that is, rights must be fairly derived by standard modes of legal interpretation from the text, structure, and history of the Constitution. Or, as it has been aptly put, "the work of the political branches is to be invalidated only in accord with an inference whose starting point, whose underlying premise, is fairly discoverable in the Constitution. That the complete inference will not be found there—because the situation is not likely to have been foreseen—is generally common

ground." J. Ely, *Democracy and Distrust* 2 (1980). These views are, however, completely irrelevant to the function of a circuit judge. The Supreme Court has decided that it may create new constitutional rights and, as judges of constitutionally inferior courts, we are bound absolutely by that determination. The only questions open for us are whether the Supreme Court has created a right which, fairly defined, covers the case before us or whether the Supreme Court has specified a mode of analysis, a methodology, which, honestly applied, reaches the case we must now decide.

circumstances, begin to create new rights freely, the volume of decisions would mean that many would evade Supreme Court review, a great body of judge-made law would grow up, and we would have "preempt[ed] for [ourselves] another part of the governance of the country without express constitutional authority." If the revolution in sexual mores that appellant proclaims is in fact ever to arrive, we think it must arrive through the moral choices of the people and their elected representatives, not through the ukase of this court.

Turning from the decided cases, which we do not think provide even an ambiguous warrant for the constitutional right he seeks, appellant offers arguments based upon a constitutional theory. Though that theory is obviously untenable, it is so often heard that it is worth stating briefly why we reject it.

Appellant denies that morality can ever be the basis for legislation or, more specifically, for a naval regulation, and asserts two reasons why that is so. The first argument is: "if the military can defend its blanket exclusion of homosexuals on the ground that they are offensive to the majority or to the military's view of what is socially acceptable, then no rights are safe from encroachment and no minority is protected against discrimination." Appellant's Opening Brief on Appeal at 11–12. Passing the inaccurate characterization of the Navy's position here, it deserves to be said that this argument is completely frivolous. The Constitution has provisions that create specific rights. These protect, among others, racial, ethnic, and religious minorities. If a court refuses to create a new constitutional right to protect homosexual conduct, the court does not thereby destroy established constitutional rights that are solidly based in constitutional text and history.

Appellant goes further, however, and contends that the existence of moral disapproval for certain types of behavior is the very fact that disables government from regulating it. He says that as a matter of general constitutional principle, "it is difficult to understand how an adult's selection of a partner to share sexual intimacy is not immune from burden by the state as an element of constitutionally protected privacy. That the particular choice of partner may be repugnant to the majority argues for its vigilant protection—not its vulnerability to sanction." Appellant's Opening Brief on Appeal at 13. This theory that majority morality and majority choice is always made presumptively invalid by the Constitution attacks the very predicate of democratic government. When the Constitution does not speak to the contrary, the choices of those put in authority by the electoral process, or those who are accountable to such persons, come before us not as suspect because majoritarian but as conclusively valid for that very reason. We stress, because the possibility of being misunderstood is so great, that this deference to democratic choice does not apply where the Constitution removes the choice from majorities. Appellant's theory would, in fact, destroy the basis for much of the most valued legislation our society has. It would, for example, render legislation about civil rights, worker safety, the preservation of the environment, and much more, unconstitutional. In each of these areas, legislative majorities have made moral choices contrary to the desires of minorities. It is to be doubted that very many laws exist whose ultimate justification does not rest upon the society's morality.[6] For these reasons, appellant's argument will not withstand examination.

■ We conclude, therefore, that we can find no constitutional right to engage in homosexual conduct and that, as judges, we have no warrant to create one. We

---

**6.** At oral argument, appellant's counsel was pressed by the court concerning his proposition that the naval regulations may not permissibly be founded in moral judgments. Asked whether moral abhorrence could never be a basis for a regulation, counsel replied that it could not.

Asked then about the propriety of prohibiting bestiality, counsel replied that that could be prohibited but on the ground of cruelty to animals. The objection to cruelty to animals is, of course, an objection on grounds of morality.

need ask, therefore, only whether the Navy's policy is rationally related to a permissible end. *See Kelley v. Johnson,* 425 U.S. 238, 247–49, 96 S.Ct. 1440, 1445–47, 47 L.Ed.2d 708 (1976). We have said that legislation may implement morality. So viewed, this regulation bears a rational relationship to a permissible end. It may be argued, however, that a naval regulation, unlike the act of a legislature, must be rationally related not to morality for its own sake but to some further end which the Navy is entitled to pursue because of the Navy's assigned function. We need not decide that question because, if such a connection is required, this regulation is plainly a rational means of advancing a legitimate, indeed a crucial, interest common to all our armed forces. To ask the question is to answer it. The effects of homosexual conduct within a naval or military unit are almost certain to be harmful to morale and discipline. The Navy is not required to produce social science data or the results of controlled experiments to prove what common sense and common experience demonstrate. This very case illustrates dangers of the sort the Navy is entitled to consider: a 27-year-old petty officer had repeated sexual relations with a 19-year-old seaman recruit. The latter then chose to break off the relationship. Episodes of this sort are certain to be deleterious to morale and discipline, to call into question the even-handedness of superiors' dealings with lower ranks, to make personal dealings uncomfortable where the relationship is sexually ambiguous, to generate dislike and disapproval among many who find homosexuality morally offensive, and, it must be said, given the powers of military superiors over their inferiors, to enhance the possibility of homosexual seduction.

The Navy's policy requiring discharge of those who engage in homosexual conduct serves legitimate state interests which include the maintenance of "discipline, good order and morale[,] ... mutual trust and confidence among service members, ... insur[ing] the integrity of the system of rank and command, ... recruit[ing] and re-

tain[ing] members of the naval service ... and ... prevent[ing] breaches of security." SEC/NAV 1900.9D (Mar. 12, 1981); J.A. at 219. We believe that the policy requiring discharge for homosexual conduct is a rational means of achieving these legitimate interests. *See Beller v. Middendorf,* 632 F.2d 788, 812 (9th Cir.), *cert. denied,* 452 U.S. 905, 101 S.Ct. 3030, 69 L.Ed.2d 405 (1980). The unique needs of the military, "a specialized society separate from civilian society," *Parker v. Levy,* 417 U.S. 733, 743, 94 S.Ct. 2547, 2555, 41 L.Ed.2d 439 (1974), justify the Navy's determination that homosexual conduct impairs its capacity to carry out its mission.

*Affirmed.*