Clifford D. FUGATE and Robert Dennis Barnhart, Plaintiffs-Appellants,

v.

PHOENIX CIVIL SERVICE BOARD; Carolyn Carr Smith, Jane Clark, Harold Klaiber, and Snead Parker, members, individually and in official capacities; Lawrence Wetzel, Chief of Police for the City of Phoenix Police Department; and City of Phoenix, a municipal corporation, Defendants-Appellees.

No. 84–1882.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 11, 1985.

Decided June 10, 1986.

---

Robert E. Jones, Jr., Napier & Jones, Phoenix, Ariz., for plaintiffs-appellants.

Peter G. Kline, Jones, Skelton & Hochuli, Phoenix, Ariz., for defendants-appellees.

Before: GOODWIN, WALLACE, and NELSON, Circuit Judges.

NELSON, Circuit Judge.

Fugate and Barnhart appeal from a summary judgment entered in favor of the Phoenix Civil Service Board in their action for back pay and injunctive relief filed pursuant to 42 U.S.C. § 1983 (1982). We have jurisdiction under 28 U.S.C. § 1291 (1982), and we affirm.

## I

## FACTS

Appellants Fugate and Barnhart are vice officers with the City of Phoenix Police Department. In 1978, a prostitute revealed to Appellants' superiors that sexual relationships had existed between herself and Officer Fugate, and between another prostitute and Officer Barnhart. The department investigated and verified the prostitute's story, and learned, among other things: (1) that the relationships had involved intimate contact while on-duty; (2) that the prostitute involved with Officer Barnhart was accepting city money from him as a paid informant; and (3) that both relationships were carried on openly and publicly, and were well known among prostitutes and in the County Attorney's office. Based on this investigation, the City discharged the officers for violating a general order of the department.

The officers appealed to the Phoenix Civil Service Board, which reinstated the officers but did not order back pay for the

period during which the officers had been suspended. The officers then filed an action for backpay and injunctive relief, asserting violations of their constitutional rights.

The City initially defended the action on the ground that the officers violated a statute prohibiting adultery. The officers challenged both the applicability and constitutionality of the statute. The district court entered summary judgment for the City. We remanded the case for the district court to determine: (1) whether the officers had committed "adultery" within the meaning of Ariz.Rev.Stat.Ann. § 13–1408 (1978); and (2) if not, whether the Civil Service Board would have reached the same result for other specifications of misconduct. *See Andrade v. City of Phoenix*, 692 F.2d 557, 559–60 (9th Cir.1982) (per curiam).

On remand, the district court held that the City had not proven that the officers violated the adultery statute. The Civil Service Board then concluded that, even absent the statutory violation, the undisputed facts would have led the Board to impose the same suspension and loss of pay on the officers for "conduct unbecoming an officer and contrary to the general orders of the police department." The district court granted summary judgment to the Civil Service Board. We are again presented with the officers' claim.[1]

## II

## DISCUSSION

The officers claim that the City violated their constitutional right of privacy by punishing them for their private sexual activities. The City claims that its actions were justified, under *Kelley v. Johnson*, 425 U.S. 238, 96 S.Ct. 1440, 47 L.Ed.2d 708 (1976) because they arose out of the City's method of organizing its police force. We agree with the City.

1. The separation notice alleged a number of violations of a departmental order, but the actual dismissal, later modified, was based upon the allegation that one or more acts of adultery contrary to Arizona law violated departmental rules requiring all officers to be law abiding.

### A. The Officers' Privacy Claim.

We note at the outset that the courts are divided concerning the extent of police officers' constitutional privacy rights. *Compare Briggs v. North Muskegon Police Department*, 563 F.Supp. 585 (W.D.Mich. 1983) (officer's dismissal for living with a married woman not his wife violated his constitutional right of privacy), *aff'd*, 746 F.2d 1475 (6th Cir.1984) *with Wilson v. Swing*, 463 F.Supp. 555, 563 (M.D.N.C. 1978) (officer's adulterous conduct not protected by constitutional right of association or analogous right of privacy). In order to place the question in proper perspective, we begin by reviewing the origin and development of the constitutional right of privacy.

#### 1. The Right of Privacy

The Constitution does not expressly guarantee the right of privacy. Nevertheless, the Supreme Court has held that the right is implicitly guaranteed by the Constitution as one aspect of the "liberty" protected by the Due Process clause of the fourteenth amendment, *see Carey v. Population Services International*, 431 U.S. 678, 684, 97 S.Ct. 2010, 2015, 52 L.Ed.2d 675 (1977), or as one of the "penumbral" rights formed by "emanations" from the express guarantees of the Bill of Rights, *Griswold v. Connecticut*, 381 U.S. 479, 484–85, 85 S.Ct. 1678, 1681–82, 14 L.Ed.2d 510 (1965).

The right of privacy is closely connected with the integrity and sanctity of the family. Many of the Court's early decisions implicating the right of privacy arose in the context of husband-wife and parent-child relationships. The fundamental rights associated with family relationships, first articulated as privacy rights in *Griswold*, had their origins in cases such as *Meyer v. Nebraska*, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923), *Pierce v. Society of Sisters*, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925), and *Skinner v. Oklahoma ex rel. Williamson*, 316 U.S. 535, 62 S.Ct.

Subsequent proceedings obscured the basis for dismissal. The Civil Service Board apparently sustained the charge of "conduct unbecoming an officer; that which tends to bring discredit upon the department."

1110, 86 L.Ed. 1655 (1942). In *Meyer* and *Pierce*, the Court established the rights of parents to direct the upbringing of their children and to place their children in private schools. *See Meyer*, 262 U.S. at 399–403, 43 S.Ct. at 626–28; *Pierce*, 268 U.S. at 534–35, 45 S.Ct. at 573–74. In *Skinner*, which invalidated legislation mandating the sterilization of habitual criminals, the Court held that the right to procreate within marriage was one of "the basic civil rights of man. Marriage and procreation are fundamental to the very existence and survival of the race." 316 U.S. at 541, 62 S.Ct. at 1113; *see also Zablocki v. Redhail*, 434 U.S. 374, 386, 98 S.Ct. 673, 681, 54 L.Ed.2d 618 (1978) ("if appellee's right to procreate means anything at all it must imply some right to enter [into marriage,] the only relationship in which the State of Wisconsin allows sexual relations legally to take place") (footnote omitted).

In *Griswold*, the first of the modern Supreme Court decisions defining the right of privacy, the Court struck down legislation that interfered with the rights of married persons to use contraceptives. The Court grounded its opinion in the sanctity of marriage:

> Would we allow the police to search the sacred precincts of marital bedrooms for telltale signs of the use of contraceptives? The very idea is repulsive to the notions of privacy surrounding the marriage relationship.
>
> We deal with a right of privacy older than the Bill of Rights—older than our political parties, older than our school system. Marriage is a coming together for better or for worse, hopefully enduring, and intimate to the degree of being sacred. It is an association that promotes a way of life, not causes; a harmony in living, not political faiths; a bilateral loyalty, not commercial or social projects. Yet it is an association for as noble a purpose as any involved in our prior decisions.

381 U.S. at 485–86, 85 S.Ct. at 1682.

Since *Griswold*, the Court has continued to stress the constitutional protection of marital and family integrity. *See, e.g., Moore v. City of East Cleveland*, 431 U.S. 494, 503–04, 97 S.Ct. 1932, 1937–38, 52 L.Ed.2d 531 (1977) (plurality opinion) (zoning ordinance intruding on choice of family living arrangements held unconstitutional because "the Constitution protects the sanctity of the family");[2] *Zablocki*, 434 U.S. at 386, 98 S.Ct. at 681 (statute prohibiting marriage of individuals whose support obligations were in arrears, or whose children were likely to become public charges, struck down because "it would make little sense to recognize a right of privacy with respect to other matters of family life and not with respect to the decision to enter the relationship that is the foundation of the family in our society").

Not all of the Supreme Court's privacy decisions, however, derive from this concern for the sanctity and integrity of marriage and the family. The privacy rights implicated by the desires of single persons to use contraceptives, and by the desires of minor and adult women to obtain abortions, are related to questions of family life but have a different philosophical basis.

In *Eisenstadt v. Baird*, 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972), the Court struck down a statute prohibiting the distribution of contraceptives to single persons. Reasoning that the state had failed to demonstrate a purpose for the dissimilar treatment of married and unmarried persons, the Court held that the statute violated the Equal Protection Clause of the Constitution. In so doing, the Court stated that "[i]f the right of privacy means anything, it is the right of the *individual*, married or single, to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child." 405 U.S. at 453, 92 S.Ct. at 1038 (emphasis in original).

The Court in *Carey* subsequently relied on this language, and on the abortion deci-

**2.** The Court's special regard for familial relationships in *Moore* becomes particularly evident when *Moore* is contrasted with *Village of Belle Terre v. Boraas*, 416 U.S. 1, 7–8, 94 S.Ct. 1536, 1540–41, 39 L.Ed.2d 797 (1974), in which the Court upheld zoning regulations prohibiting the cohabitation of three or more *unrelated* individuals.

sion in *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), to emphasize that the privacy right "protects individual decisions in matters of childbearing," and that this "constitutional protection of *individual autonomy* in matters of childbearing is not dependent" on marital status and family ties. *Carey*, 431 U.S. at 687, 97 S.Ct. at 2017 (emphasis added); *see also Planned Parenthood v. Danforth*, 428 U.S. 52, 69, 74, 96 S.Ct. 2831, 2841, 2843, 49 L.Ed.2d 788 (1976) (state cannot condition right to abortion in first twelve weeks of pregnancy upon consent of spouse, nor, in the case of unmarried minors, upon parental consent).

Taken as a whole, the Supreme Court cases do not establish a single, clear and unifying principle establishing a unitary right of privacy that provides the lower courts with guidance on its application. *See Dronenburg v. Zech*, 741 F.2d 1388, 1391–96 (D.C.Cir.1984) (*Dronenburg I*); *see also Dronenburg v. Zech*, 746 F.2d 1579, 1582–84 (D.C.Cir.1984) (Bork, J., concurring in denial of rehearing en banc) (*Dronenburg II*). This, however, is not due to the *absence* of principle from these cases, but rather to the presence of *two* partially coextensive analytical principles: the sanctity of marriage and family, and the exercise of personal autonomy.

### 2. Extensions Of The Personal Autonomy Principle of Privacy

The Supreme Court has specifically extended the personal autonomy principle of privacy to only two situations: (1) the right of unmarried persons to use contraceptives (in *Eisenstadt* and *Carey*); and (2) the right to obtain abortions under certain circumstances (in *Roe* and *Danforth*). Thus,

although the contraceptive and abortion decisions may support arguments in favor of extending the right of privacy to include consensual sexual activities, the Supreme Court has not yet made this express interpretation.[3]

This court chose to extend the right of privacy into the area of private sexual activity in *Thorne v. City of El Segundo*, 726 F.2d 459 (9th Cir.1983), *cert. denied*, —— U.S. ——, 105 S.Ct. 380, 83 L.Ed.2d 315 (1984). In that case, Thorne, a single woman, worked for the City of El Segundo as a clerk-typist in the police department. She applied for a position as an El Segundo police officer, but was denied the position, in part, because she admitted having an affair with a married El Segundo police officer. *Id.* at 466. Thorne claimed that the City's inquiry into her sex life violated her rights of privacy and free association.[4] This court found that Thorne's interests "in the privacy of her sexual activities [were] within the zone protected by the [C]onstitution." *Id.* at 468. We concluded that because Thorne's "private, off-duty" sexual activities were protected, and because the city could demonstrate no "impact upon an applicant's on-the-job performance," and failed to show "specific policies with narrow implementing regulations," the City's rejection of Thorne for employment was impermissible. *Id.* at 471.[5]

### 3. The Instant Case

Fugate and Barnhart contend that the City of Phoenix intruded on their constitutionally protected interests in the privacy of their sexual activities, and that the City therefore must meet the same burden of justification that we imposed upon the City of El Segundo in *Thorne*. We disagree.

---

**3.** We note, however, that the Court may soon decide whether the right of privacy extends to private sexual conduct between consenting adults. This question is currently before the Court in *Hardwick v. Bowers*, 760 F.2d 1202 (11th Cir.), *cert. granted*, —— U.S. ——, 106 S.Ct. 342, 88 L.Ed.2d 284 (1985).

**4.** Thorne also brought a sex discrimination claim against the City of El Segundo under Title VII, 42 U.S.C. § 2000e *et seq.* This aspect of *Thorne* does not bear on the instant case.

**5.** The court stated that the City had the burden of showing "that its inquiry into appellant's sex life was justified by the legitimate interests of the police department, that the inquiry was narrowly tailored to meet those legitimate interests, and that the department's use of the information it obtained about [Thorne's] sexual history was proper in light of the state's interests." 726 F.2d at 469.

In *Thorne,* we recognized a right of privacy in "private, off-duty" sexual behavior. 726 F.2d at 471. In the present case we confront police officers who engaged in sexual relations while on the job. In *Thorne,* the City made no showing that Thorne's sexual activities "affected or could potentially affect her job performance." *Id.* In the present case, the City has demonstrated that Appellants' job performance was threatened by obvious conflicts of interest as well as by the possibility of blackmail. In *Thorne,* the sexual activities in question were "not a matter of public knowledge, and could not therefore diminish the department's reputation in the community ... or cause morale problems within the department." *Id.* In the present case, the officers' sexual activities were carried on openly and were widely known.

█ Fugate and Barnhart, then, ask us to find that *Thorne*'s protection of the right of privacy extends to sexual behavior that is not purely private, that compromises a police officer's performance, and that threatens to undermine a police department's internal morale and community reputation. We find that *Thorne*'s protection does not extend that far.[6]

### B. The City's Position.

The City, citing *Kelley v. Johnson,* 425 U.S. 238, 96 S.Ct. 1440, 47 L.Ed.2d 708 (1976), argues that the officers must demonstrate that there is no rational connection between the regulation in question and the promotion of safety of persons and property. *See id.* at 247, 96 S.Ct. at 1445. We agree with the City.

In *Kelley,* a police officer challenged the constitutionality of a departmental order establishing hair-grooming standards for male members of the police force. The Supreme Court stated that the county's organizational decisions regarding law enforcement personnel, as legitimate expressions of the State's police power, were entitled to the same "presumption of legisla-

tive validity" that would attach to other decisions within that power. *Id.* at 247, 96 S.Ct. at 1445. The Court then found that because the hair-grooming regulation was "based ... on the county's method of organizing its police force," the regulation *was* entitled to the presumption of validity, and the burden fell on the officer to "demonstrate that there [was] no rational connection between the regulation ... and the promotion of safety of persons and property." *Id.*

The threshold question in the present case is thus whether the departmental regulation prohibiting "conduct unbecoming an officer and contrary to the general orders of the police department" is based on the City's method of organizing its police force. If it *is* based on such a method, then the regulation is presumptively valid, and Officers Fugate and Barnhart carry the burden of demonstrating the absence of any rational connection between the regulation and the promotion of public safety. If the regulation is *not* based on such a method, then it is not entitled to the presumption of validity accorded legitimate expressions of the State police power, and is subject to whatever level of scrutiny is appropriate for the constitutional interest that is implicated.

█ The City has legitimate interests in maintaining the moral, integrity, and public acceptance of the police department, and in minimizing conflicts of interest and risks of blackmail. In order to protect these interests, the City must establish regulations governing police officers' behavior:

> Discipline and accountability are essential to the police agency. The integrity of the police agency car be maintained by an effective and responsive discipline system. Certainly public support will be strengthened by protecting [the public] from police misconduct and corruption through ... the correction or removal of employees guilty of misconduct.
>
> [D]iscipline ... assists in establishing the prestige of the organization in the

---

6. We need not, and therefore do not, decide here the exact limits of the right of privacy in sexual activities recognized in *Thorne.*

specific occupational field and the general community, in maintaining effective agency performance, and preserving employee morale. An inadequate discipline system many times will produce the opposite effect on an organization.

National Advisory Commission of Criminal Justice Standards and Goals, *Report on Police* 469–70 (1973). Regulations concerning officers' conduct, then, do not merely fall within a city's method of organizing its police department; they are a vital part of that method.

█ This case involves just such a regulation. The departmental order prohibiting "conduct unbecoming an officer and contrary to the general orders of the police department," while admittedly vague,[7] is clearly intended to protect the legitimate interests of the department from potentially damaging behavior by the department's officers. To the extent that the regulation operates to further this end, it is unquestionably based on the City's method of organizing its police force, and is entitled to a presumption of legislative validity.

There is no doubt that Fugate and Barnhart behaved in a manner which threatened the department's legitimate interests. As discussed above, Appellants' activities created conflicts of interest, compromised their performance as officers, raised the possibility of blackmail, threatened the morale of the department, and jeopardized the department's reputation in the community. Under these circumstances, we have no difficulty finding that the regulation in question operated as part of the City's method of organizing its police force, and is presumptively valid.

Fugate and Barnhart thus carry the burden of demonstrating that there is no rational connection between the regulation in question and the promotion of safety of persons and property. *See* 425 U.S. at 247, 96 S.Ct. at 1445. Because the officers have failed to show the absence of such a connec-

tion, the decision of the district court is affirmed. The City is entitled to its attorney fees and costs.

AFFIRMED.

WALLACE, Circuit Judge, concurring:

I concur generally in the majority opinion. I agree that the officers' extramarital relationships with the two prostitutes are not protected by the constitutional right of privacy. I further agree that the officers have failed to meet their legal burden under *Kelley v. Johnson,* 425 U.S. 238, 96 S.Ct. 1440, 47 L.Ed.2d 708 (1976), of showing the absence of a rational connection between the regulation under which they were disciplined and the promotion of public safety. I therefore join in affirming the district court's order granting summary judgment in favor of the defendants.

I write separately to present what I believe is the proper approach to the officers' constitutional right of privacy claims. I fully accept the majority's delineation of two separate lines of Supreme Court privacy decisions. In addition, I believe that the differing histories of these two lines provide important guidance in addressing right of privacy claims.

I

The principle of privacy that protects the sanctity and integrity of marriage and the family is deeply rooted and has been carefully and fully elaborated, as the long line of cases cited by the majority amply demonstrates. Maj. op. at 738–39. Marriage is " 'the most important relation in life,' " and " 'the foundation of the family and of society, without which there would be neither civilization nor progress.' " *Zablocki v. Redhail,* 434 U.S. 374, 384, 98 S.Ct. 673, 679, 54 L.Ed.2d 618 (1978), *quoting Maynard v. Hill,* 125 U.S. 190, 205, 211, 8 S.Ct. 723, 726, 729, 31 L.Ed. 654 (1888). Similarly, "the Constitution protects the sanctity of the family precisely because the institution of the family is deeply rooted in this Nation's history and tradition. It is through

---

7. Because the parties did not raise the question below, we do not reach possible challenges to the departmental regulation based upon vagueness or overbreadth. We note in passing, however, that a similar regulation withstood this type of challenge in *Kannisto v. City and County of San Francisco,* 541 F.2d 841 (9th Cir.1976), *cert. denied,* 430 U.S. 931, 97 S.Ct. 1552, 51 L.Ed.2d 775 (1977).

the family that we inculcate and pass down many of our most cherished values, moral and cultural." *Moore v. City of East Cleveland,* 431 U.S. 494, 503–04, 97 S.Ct. 1932, 1937–38, 52 L.Ed.2d 531 (1977) (plurality opinion) (footnotes omitted).

By contrast, the principle of privacy that protects the exercise of personal autonomy is of recent vintage and uncertain scope. As the majority properly points out, the Supreme Court has extended the personal autonomy principle of privacy to only two situations: the right of unmarried persons to use contraceptives in *Eisenstadt v. Baird,* 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972), and *Carey v. Population Services International,* 431 U.S. 678, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977) (*Carey*), and the right to obtain abortions under certain circumstances in *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), and *Planned Parenthood of Central Missouri v. Danforth,* 428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976). This aspect of the right to privacy is clearly limited, and the Court has not chosen to extend it beyond those situations. In *Carey,* the Court was careful to limit its analysis to " 'an individual's right to decide to prevent conception or terminate pregnancy,' " 431 U.S. at 688 n. 5, 97 S.Ct. at 2018 n. 5; it did not purport to protect every case that " 'implicates sexual freedom' ... or 'affect[s] adult sexual relations.' " *Id.* The plurality part of the opinion echoed this view, *see id.* at 694 n. 17, 97 S.Ct. at 2021 n. 17 (plurality opinion), as did Justice White in his concurrence. *See id.* at 702, 97 S.Ct. at 2025 (White, J., concurring). Consistent with this approach, the Court had earlier upheld without opinion a Virginia anti-sodomy statute. *Doe v. Commonwealth's Attorney for Richmond,* 425 U.S. 901, 96 S.Ct. 1489, 47 L.Ed.2d 751 (1976) (*Doe*). While there is a dispute over whether this decision involved privacy or standing, *compare Baker v. Wade,* 769 F.2d 289, 292 (5th Cir.1985) (*Doe* was decided on privacy grounds), *and Dronenburg v. Zech,* 741 F.2d 1388, 1391–92 (D.C.Cir.1984) (*Dronenburg I*) (same), *with Hardwick v. Bowers,* 760 F.2d 1202, 1207–10 (11th Cir.) (*Doe* was limited to standing) (*Hardwick*),

*cert. granted,* —— U.S. ——, 106 S.Ct. 342, 88 L.Ed.2d 284 (1985), the Supreme Court has never extended the right of privacy to protect homosexual relations.

Thus, although an argument could be constructed from the contraceptive and abortion decisions to extend the right of privacy to consensual sexual activities, the Court has expressly refrained from this interpretation. *See also Dronenburg I,* 741 F.2d at 1395–98 (no constitutional right to engage in homosexual conduct); *Andrade v. City of Phoenix,* 692 F.2d 557, 563–65 (9th Cir.1982) (per curiam) (Wallace, J., concurring) (no constitutional right to engage in adultery); Hafen, *The Constitutional Status of Marriage, Kinship, and Sexual Privacy—Balancing the Individual and Social Interests,* 81 Mich.L.Rev. 463, 538, 542–44 (1983) (Supreme Court has not recognized a right to sexual privacy outside marriage).

## II

In light of Supreme Court refusal to extend the personal autonomy principle of privacy, I believe that we should be careful in doing so. *See Dronenburg v. Zech,* 746 F.2d 1579, 1582–84 (D.C.Cir.1984) (Bork, J., concurring in denial of rehearing en banc). Recognizing the narrowness of our holding in *Thorne v. City of El Segundo,* 726 F.2d 459 (9th Cir.1983) (*Thorne*), *cert. denied,* —— U.S. ——, 105 S.Ct. 380, 83 L.Ed.2d 315 (1984), is critical. There is no indication that anyone other than Thorne and her paramour had knowledge of their extramarital relationship. The affair had been private. Furthermore, there was no reason to believe it would lose that closed cover of privacy since it had already terminated. The two participants had every reasonable expectation that their secret relationship would not be open to the eyes of any third person. Thus, this rule emerges from *Thorne:* a person asserting a sexual privacy interest must demonstrate that an expectation of privacy with regard to the asserted interest was both subjectively held and objectively reasonable. In the absence of such a showing, the privacy interest is not protected, and the state need not demonstrate a compelling interest. *See Paris Adult Theatre I v. Sla-*

*ton,* 413 U.S. 49, 66 & n. 13, 93 S.Ct. 2628, 2640 & n. 13, 37 L.Ed.2d 446 (1973) (no reasonable expectation of privacy for public activity); *National Gay Task Force v. Board of Education,* 729 F.2d 1270, 1273 (10th Cir.1984) (Constitution permits regulation of homosexual conduct that "is indiscreet and not practiced in private"), *affirmed by equally divided court,* —— U.S. ——, 105 S.Ct. 1858, 84 L.Ed.2d 776 (1985); *Lovisi v. Slayton,* 539 F.2d 349, 351–52 (4th Cir.) (en banc) (couple had no reasonable expectation of privacy in intimate acts since they had invited onlooker into their bedroom), *cert. denied,* 429 U.S. 977, 97 S.Ct. 485, 50 L.Ed.2d 585 (1976); *Swope v. Bratton,* 541 F.Supp. 99, 109 (W.D.Ark.1982) (no protection if relationship is "open and notorious"). *Cf. Katz v. United States,* 389 U.S. 347, 351–52, 88 S.Ct. 507, 511–12, 19 L.Ed.2d 576 (1967) (fourth amendment protects only reasonable expectations of privacy).

In this case, the undisputed facts demonstrate that the sexual relationships were not purely private. Both officers saw their girlfriends while on duty, and both officers conducted their boyfriend-girlfriend relationships in public without attempts at concealment. The relationships were a matter of common knowledge within the police department and the county attorney's office. These facts distinguish this case from *Thorne,* in which we were careful to point out that the affair was not a matter of public knowledge. *See* 726 F.2d at 471.

Moreover, contrary to the officers' assertions, a review of the record demonstrates that the officers were not punished for any particular sexual *acts,* but for their sexual *relationships* that existed over a long period of time. This is not a case in which the officers were punished for committing a proscribed sexual act in their homes, *see Hardwick,* 760 F.2d at 1212; *see also Stanley v. Georgia,* 394 U.S. 557, 564–68, 89 S.Ct. 1243, 1247–50, 22 L.Ed.2d 542 (1969) (private use of obscene materials in the home cannot be criminal in light of privacy interest). Thus, although the particular sexual acts between the officers and their girlfriends may have taken place in private, their relationships were carried on in public,

and the sexual dimensions were not concealed. Under these circumstances, the officers have failed to demonstrate a reasonable expectation of privacy in their relationships by virtue of their open and notorious conduct. Thus, I would conclude that their conduct was not protected by the personal autonomy aspect of the constitutional right to privacy.