John DOE

v.

William J. CASEY, Director, C.I.A., Appellant.

No. 85–5291.

United States Court of Appeals, District of Columbia Circuit.

Argued March 13, 1986.

Decided Aug. 1, 1986.

Barbara C. Biddle, Atty., Dept. of Justice, with whom Richard K. Willard, Acting Asst. Atty. Gen., Joseph E. diGenova, U.S. Atty., and Barbara L. Herwig, Atty., Dept. of Justice, Washington, D.C., were on the brief for appellant.

Mark H. Lynch, with whom Susan W. Shaffer, Washington, D.C., was on the brief for appellee.

Before EDWARDS, GINSBURG and BUCKLEY, Circuit Judges.

Opinion for the Court filed by HARRY T. EDWARDS, Circuit Judge.

Concurring opinion filed by GINSBURG, Circuit Judge.

Opinion concurring in part and dissenting in part filed by BUCKLEY, Circuit Judge.

HARRY T. EDWARDS, Circuit Judge:

The Central Intelligence Agency ("CIA") appeals from a District Court order requiring the CIA to reinstate a former undercover employee to administrative leave status. The undercover employee—appellee John Doe—was terminated from CIA employment after he informed the CIA of his homosexuality. Doe's employment was terminated by the Director of Central Intelligence ("Director"), acting under section 102(c) of the National Security Act of 1947, which provides that the Director may, in his discretion, terminate the employment of any CIA employee "whenever he shall deem such termination necessary or advisable in the interests of the United States." [1]

Doe commenced this action in District Court, seeking reinstatement to his old position, or, in the alternative, reinstatement to administrative leave status and a reconsideration of the CIA's decision to terminate his employment. He alleges that he was terminated without adequate procedural protections in violation of CIA regulations, the Administrative Procedure Act ("APA"), and the due process clause of the Fifth Amendment. The District Court ordered Doe reinstated to administrative leave status and directed the CIA to reconsider Doe's termination using procedures that would provide Doe with a meaningful statement of the CIA's reasons and an opportunity to respond.

On appeal, the Government argues principally that the CIA's decision to terminate Doe's employment under section 102(c) is not subject to judicial review. Although section 102(c) gives the Director of Central Intelligence broad discretion, we conclude that judicial review is neither precluded by

---

1. 50 U.S.C. § 403(c) (1982).

statute nor foreclosed by the absence of judicially manageable standards. We reverse the judgment of the District Court, however, because the court failed to accord sufficient deference to the judgment of the head of the agency. Given the sensitive nature of decisions by the Director of Central Intelligence concerning removal of employees under section 102(c), we hold that an employee must present some concrete evidence of an impermissible basis for his or her termination before a court may require the CIA to explain the reason for that termination. No such evidence was presented by Doe in this case. Nonetheless, because the record is unclear on certain critical points, we remand for further proceedings.

## I. BACKGROUND

The plaintiff, John Doe,[2] had a nine-year career with the CIA. Although he began that career as a clerk-typist, he was eventually promoted, after agency training, to a covert position as an electronics technician. Periodic fitness reports consistently rated Doe as either an excellent or an outstanding employee, and the CIA expressed no dissatisfaction with either Doe's work or his loyalty.

On January 28, 1982, Doe voluntarily informed a CIA security officer that he was a homosexual. As a result, the CIA placed Doe on administrative leave on February 2, 1982, pending an investigation of his homosexuality. Under this status, Doe did not report for work, but the CIA continued to pay his salary. On February 12 and 17, Doe was interviewed at length by a polygraph officer about his sexual orientation and possible security violations. After these interviews, which lasted a total of ten hours, the officer told Doe that the polygraph indicated that he had truthfully answered all questions. His answers included statements that he had not had sexual relations with any foreign nationals and had not disclosed classified information to any sexual partners.

The polygraph officer prepared a five-page factual report based on the two days of interviews. Doe reviewed this factual report on March 23, 1982, and, in addition, Doe prepared a two-page addendum. On April 14, 1982, a CIA security officer informed Doe that the CIA's Office of Security had determined that the circumstances of his homosexuality posed a security threat, but refused to explain why Doe's homosexuality posed such a danger. Throughout the previous two months of investigation, Doe had received conflicting explanations about the CIA's policy toward homosexuals. While two CIA security officers told Doe that his homosexual activities violated CIA regulations, the Deputy General Counsel of the CIA told Doe's counsel that homosexuality was a security concern that did not inevitably result in termination. Instead, according to the Deputy General Counsel, the CIA considers homosexuality on a case-by-case basis.

Doe was asked to resign on April 14, but refused to do so. The Office of Security then recommended to the Director of Central Intelligence that the CIA terminate Doe's employment. On April 20, Doe's counsel delivered a detailed letter to the Director concerning Doe's case, but the CIA made no response.

On May 12, 1982, a security officer informed Doe that the Director had terminated his employment effective May 7, 1982. Doe's counsel later received a letter from the Deputy General Counsel of the CIA dated May 11, 1982, confirming Doe's termination:

> The Director has reviewed the facts of your client's case, your client's memorandum commenting upon those facts, the Office of Security's evaluation of the security significance of those facts, and the statement submitted by you in your client's behalf.
>
> After careful consideration of this matter, the Director has deemed it necessary and advisable in the interests of the Unit-

2. John Doe is proceeding under a pseudonym only because his status as a CIA employee can-

not be publicly acknowledged, not because of any embarrassment about his homosexuality.

ed States to terminate your client's employment with this Agency pursuant to section 102(c) of the National Security act [sic] of 1947, as amended.[3]

Doe was never told why he was considered a security risk and never had access to the Office of Security evaluations. The Director's decision to terminate Doe's employment was made pursuant to section 102(c) of the National Security Act, which provides:

> Notwithstanding the provisions of section 7501 of title 5, or the provisions of any other law, the Director of Central Intelligence may, in his discretion, terminate the employment of any officer or employee of the Agency whenever he shall deem such termination necessary or advisable in the interests of the United States, but such termination shall not affect the right of such officer or employee to seek or accept employment in any other department or agency of the Government if declared eligible for such employment by the Director of the Office of Personnel Management.[4]

CIA officials told Doe that the agency would give a positive recommendation on his behalf to any prospective employer; Doe also was advised that if he applied for a job that required a security clearance, the CIA would inform the prospective employer that it had determined that Doe presented a security threat "because of his homosexuality." Moreover, a member of the General Counsel's staff told Doe that he is obliged to inform the CIA whenever he applies for a job that requires a security clearance.

Doe then commenced this action in District Court. His complaint alleged that the CIA's decision to fire him because of his homosexuality violated both procedural and substantive protections to which he was entitled by law. To remedy the substantive violations, Doe sought outright reinstatement to his old position with the CIA.

For violation of procedural protections, on the other hand, Doe sought a new determination by the Director under fair procedures.[5] Doe filed a motion for partial summary judgment on the procedural claims, which were alleged violations of CIA regulations, the APA and the due process clause of the Fifth Amendment. The District Court granted Doe summary judgment on the violations alleged with respect to the CIA regulations and the APA, but declined to reach the constitutional issues. The trial court ordered Doe reinstated to administrative leave status and directed the CIA to reconsider his case using procedures that would provide Doe with a meaningful statement of the CIA's reasons for the termination and with an opportunity to respond.

This appeal followed.

## II. ANALYSIS

### A. *Preclusion of Review*

On appeal, the CIA has contended that its decision to terminate Doe's employment is not reviewable under the APA. We conclude that section 102(c) obviously requires that we give deference to the judgment of the Director of Central Intelligence; however, we cannot countenance the CIA's unprecedented attempt to preclude judicial review when it is absolutely clear that the Director's discretion is expressly limited by the terms of the statute that has been cited by the CIA to support the Director's exercise of authority.

Under section 701(a) of the APA,[6] agency actions are judicially reviewable

> except to the extent that—(1) statutes preclude judicial review; or (2) agency action is committed to agency discretion by law.

In the decades of litigation over the scope of these two grounds for preclusion, the

---

**3.** Joint Appendix ("J.A.") 31.

**4.** 50 U.S.C. § 403(c) (1982).

**5.** Doe principally seeks an explanation of precisely why his employment was terminated.

**6.** 5 U.S.C. § 701(a) (1982).

Supreme Court and this court have emphasized in the strongest terms that preclusion is the rare exception and certainly not the norm. Section 701 "creates a strong presumption of reviewability that can be rebutted only by a clear showing that judicial review would be inappropriate."[7] As the Supreme Court most recently explained:

> We ordinarily presume that Congress intends the executive to obey its statutory commands and, accordingly, that it expects the courts to grant relief when an executive violates such a command.[8]

The presumption of reviewability is firmly rooted even in pre-APA administrative law,[9] and is clearly reflected in the legislative history of the APA.[10] The compelling reasons for this presumption are well known, and recently have been reiterated in an article by Professor Sunstein:

> The presumption of reviewability under the APA is based on a set of considerations, loosely captured in the notion of the rule of law, that relate to the perceived need to constrain the exercise of discretionary power by administrative agencies. Judicial review serves important goals in promoting fidelity to statutory requirements and, where those requirements are ambiguous or vague, in increasing the likelihood that the regula-

tory process will be a reasonable exercise of discretion instead of a bow in the direction of powerful private groups.[11]

In light of the prevailing case law, there is little doubt that, in seeking to overcome the strong presumption of judicial review, the CIA shoulders a very heavy burden. We will address in turn each of the two possible grounds for the preclusion of review.

### 1. Preclusion by Statute

The first question we consider is whether Congress expressed an intention to preclude review of the Director's decision to terminate the employment of a CIA employee under section 102(c). Fortunately, the Supreme Court has elaborated several principles to guide our inquiry.

First, there must be a showing of "clear and convincing evidence" of a congressional intent to negate review before courts may legitimately restrict access to judicial review.[12] Although the "clear and convincing evidence" standard is not a rigid evidentiary test,[13] a court should not refuse to review agency action if there is substantial doubt that Congress intended to preclude review.[14] Rather, at the very least, such an intent to preclude review must be

**7.** *Natural Resources Defense Council, Inc. v. SEC,* 606 F.2d 1031, 1043 (D.C.Cir.1979); *see also Dunlop v. Bachowski,* 421 U.S. 560, 567, 95 S.Ct. 1851, 1857, 44 L.Ed.2d 377 (1975); *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 410, 91 S.Ct. 814, 820, 28 L.Ed.2d 136 (1971); *Abbott Laboratories v. Gardner,* 387 U.S. 136, 140, 87 S.Ct. 1507, 1510, 18 L.Ed.2d 681 (1967); *WWHT, Inc. v. FCC,* 656 F.2d 807, 815 (D.C.Cir.1981).

**8.** *Bowen v. Michigan Academy of Family Physicians,* —— U.S. ——, 106 S.Ct. 2133, 2140–41, 90 L.Ed.2d 623 (1986).

**9.** 5 K. DAVIS, ADMINISTRATIVE LAW TREATISE § 28.4 (2d ed. 1984).

**10.** *See* H.R. REP. No. 1980, 79th Cong., 2d Sess. 41 (1946) ("To preclude judicial review under this bill a statute, if not specific in withholding such review, must upon its face give clear and convincing evidence of an intent to withhold it.").

**11.** Sunstein, *Reviewing Agency Inaction After Heckler v. Chaney,* 52 U.CHI.L.REV. 653, 655 (1985).

**12.** *See Lindahl v. Office of Personnel Management,* 470 U.S. 768, 105 S.Ct. 1620, 1627, 84 L.Ed.2d 674 (1985); *Dunlop v. Bachowski,* 421 U.S. 560, 567, 95 S.Ct. 1851, 1857, 44 L.Ed.2d 377 (1975); *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 410, 91 S.Ct. 814, 820, 28 L.Ed.2d 136 (1971); *Abbott Laboratories v. Gardner,* 387 U.S. 136, 141, 87 S.Ct. 1507, 1511, 18 L.Ed.2d 681 (1967); *WWHT, Inc. v. FCC,* 656 F.2d 807, 809 (D.C.Cir.1981). As discussed previously, this "clear and convincing evidence" standard is based on clear congressional intent. *See* H.R.REP. No. 1980, *supra* note 10, at 41.

**13.** *Block v. Community Nutrition Institution,* 467 U.S. 340, 351, 104 S.Ct. 2450, 2457, 81 L.Ed.2d 270 (1984).

**14.** *Id.*

"fairly discernible" in the detail of the legislative scheme.[15]

Second, the Supreme Court has never found a congressional intent to preclude review when the statute at issue specifies a standard that at least purports to limit agency discretion. In *Southern Railway Co. v. Seaboard Allied Milling Corp.*,[16] for example, the Court held that the Interstate Commerce Commission's decision not to suspend and investigate a proposed rate increase was not subject to judicial review primarily because the statute was silent on what factors should guide the Commission's decision. When, however, as in *Citizens to Preserve Overton Park, Inc. v. Volpe*,[17] the statute on its face provides a standard limiting agency discretion, the Court "easily" rejects the argument that review is precluded by statute.

■ Simply stated, when agency authority is defined or limited pursuant to a substantive standard, this is highly probative evidence that Congress did not intend to preclude judicial review. Indeed, if the chosen standard is judicially manageable, it is difficult to imagine stronger evidence of an intent *not* to preclude judicial review. It may be, of course, that the standard chosen by Congress is such that it offers no meaningful basis upon which to judge the agency's exercise of discretion. In such a circumstance, however, the wiser policy is to treat the agency action as "committed to agency discretion" and hence precluded from review by section 701(a)(2).

Thus, when Congress has chosen a standard, the preclusion analysis for section 701(a)(2) rather than section 701(a)(1) is appropriate.[18]

Third, the structure of a statutory scheme sometimes may support a finding that Congress intended to preclude judicial review; however, the Supreme Court has accepted arguments based on structure only in a very limited category of cases involving uniquely complex or otherwise delicately balanced statutory schemes. The best example of this is seen in *Block v. Community Nutrition Institute*,[19] where the Supreme Court relied heavily on the omission of an express provision for participation by consumers in the development of milk-market orders as evidence of an intent to preclude consumers from seeking judicial review only because the statute included specific and detailed provisions for the participation of milk handlers and producers.[20] Moreover, the Court took care to emphasize the complexity of the statutory scheme.[21] Similarly, in *Morris v. Gressette*,[22] the Court held that the Attorney General's failure to object to a change in voting procedure was precluded from review by the Voting Rights Act of 1965. Central to the Court's decision, however, was the delicate balance between Congress' decision to authorize the Attorney General to impose the "extraordinary remedy" of postponing the effect of state legislation and Congress' desire to prevent undue de-

**15.** *Id.* (quoting *Data Processing Service v. Camp,* 397 U.S. 150, 157, 90 S.Ct. 827, 831, 25 L.Ed.2d 184 (1970)).

**16.** 442 U.S. 444, 99 S.Ct. 2388, 60 L.Ed.2d 1017 (1979).

**17.** 401 U.S. 402, 410, 91 S.Ct. 814, 820, 28 L.Ed.2d 136 (1971).

**18.** As Justice Rehnquist noted in *Heckler v. Chaney,* 470 U.S. 821, 105 S.Ct. 1649, 1655, 84 L.Ed.2d 714 (1985), section 701(a)(2)'s preclusion of review when a decision is "committed to agency discretion" would be unnecessary unless there are circumstances in which "Congress has not affirmatively precluded review," but has chosen a standard such that "a court would have no meaningful standard against which to judge the agency's exercise of discretion."

**19.** 467 U.S. 340, 104 S.Ct. 2450, 81 L.Ed.2d 270 (1984).

**20.** *Id.* at 346–47, 104 S.Ct. at 2454–55.

**21.** *See, e.g., id.* at 347, 348 & 352, 104 S.Ct. at 2455, 2456, 2458. A similar logic was used to find preclusion in *Southern Railway Co. v. Seaboard Allied Milling Corp.,* 442 U.S. 444, 99 S.Ct. 2388, 60 L.Ed.2d 1017 (1979). Congress provided mandatory language in the statute when it wished to provide judicial review. Therefore, its use of permissive language without any standard was strong evidence of an intent to preclude review.

**22.** 432 U.S. 491, 97 S.Ct. 2411, 53 L.Ed.2d 506 (1977).

lay.[23] In other cases involving less complicated or delicate statutory frameworks, nearly identical arguments based on the "statutory framework" have been unavailing.[24]

■ Under our reading of the extant case law, it is abundantly clear that the CIA has failed to carry its burden to establish clear and convincing evidence of a congressional intent to preclude judicial review in section 102(c). The language of the statute itself cannot be fairly read to preclude judicial review, and legislative history is silent on the issue. Most importantly, section 102(c) provides a standard—the termination must be "necessary or advisable in the interests of the United States." As discussed above, Congress' decision to cabin the Director's discretion by the use of this standard is compelling evidence of its intent *not* to preclude judicial review. Congress could have left section 102(c) terminations unambiguously to the Director's absolute discretion; this, however, Congress chose not to do. Finally, arguments based on the statutory "framework" simply have no force where, as here, there is a single statutory provision unaccompanied by any "scheme" or "framework."

The specific arguments made by the CIA are easily rejected. The CIA contends that the statutory language—"notwithstanding the provisions of section 7501 of title 5, or the provisions of any other law"—removes the basis for any and all judicial review. This argument is, at best, strained. Section 102(c) does not prevent the application of *all* law; instead, it merely replaces one set of standards—the more rigorous efficiency standards normally applied to the termination of federal employees [25]—with a new, more relaxed standard: that the termination be "necessary or advisable in the interests of the United States." The obvious result is that the Director of Central Intelligence has far more discretion in personnel matters than other federal agencies. This relaxation in standard, however, in no way manifests a congressional intent to preclude review altogether.

The CIA additionally maintains that the sensitive nature of its work requires that judicial review be precluded. Our inquiry, however, is limited to what *Congress* intended, not what the CIA finds preferable. Congress could have explicitly precluded judicial review; it did not do so. Or, Congress could have written section 102(c) narrowly to state that "the Director may, in his sole discretion, terminate the employment of any officer or employee of the Agency" (omitting any reference to "necessary or advisable in the interests of the United States"); it did not so limit the language of the statute.

Moreover, the CIA is unable to offer any contemporaneous legislative history suggesting that Congress intended to preclude judicial review. The CIA merely points to a Senate Report, written decades *after* the enactment of section 102(c), which incorrectly states that courts have interpreted section 102(c) as giving unlimited discretion to the Director.[26] This Report, however, is

---

23. *Id.* at 504.

24. *See, e.g., Dunlop v. Bachowski,* 421 U.S. 560, 567, 95 S.Ct. 1851, 1857, 44 L.Ed.2d 377 (1975); *Local 1219, AFGE v. Donovan,* 683 F.2d 511, 516–18 & n. 16 (D.C.Cir.1982) (permissive statutory language alone does not suggest a congressional intent to preclude review).

25. Section 102(c) specifically references only one portion of the United States Code—5 U.S.C. § 7501 (1982). This is an unambiguous reference to the statutory protections offered most federal employees. *See* 5 U.S.C. §§ 7501–14 (1982) (providing standards and procedure for adverse actions against federal employees). Under these provisions a federal employee may be dismissed "only for such cause as will promote the efficiency of the service." 5 U.S.C. § 7513(a) (1982).

26. *See* S.Rep. No. 77, 98th Cong., 1st Sess. 6–7 (1983), cited in Reply Brief for Appellant at 9. It is manifestly untrue that all courts have interpreted section 102(c) as precluding review. Indeed, this circuit in *Torpats v. McCone,* 300 F.2d 914, 915 (D.C.Cir.), *cert. denied,* 371 U.S. 886, 83 S.Ct. 182, 9 L.Ed.2d 121 (1962), upheld a termination of a CIA employee as "within the authority conferred [on the Director] by Congress" and did *not* refuse review.

simply not relevant to congressional intent in 1947.[27]

The CIA has simply failed to overcome the presumption of reviewability. Neither the statute nor legislative history offer even a hint of a congressional intent to preclude review.

### 2. *Committed to Agency Discretion*

Our next task is to determine whether the standard offered by section 102(c)—that terminations be "necessary or advisable in the interests of the United States"—commits the decisionmaking to the Director's judgment absolutely. As with the section 701(a)(1) exception, the section 701(a)(2) exception for action committed to agency discretion by law is a "narrow" exception,[28] and we operate under a presumption of reviewability.[29] Indeed, even the Government concedes that this presumption of reviewability applies. It simply asserts that that presumption is sufficiently rebutted in this case.

■ In order for the "committed to agency discretion" exception to preclude judicial review altogether, the Government must establish that "the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion."[30] There must, in other words, simply be "no law to apply."[31] The fact that a statute gives an agency broad discretion

> does not render the agency's decisions completely nonreviewable under the "committed to agency discretion by law" exception unless the statutory scheme, taken together with other relevant materials, provides absolutely no guidance as to how that discretion is to be exercised.[32]

■ In the instant case, we surely cannot find that section 102(c) offers "absolutely no guidance" as to how the Director of Central Intelligence is to exercise his or her discretion to terminate CIA employees. Obviously, courts must give great deference to the judgment of the Director as to what is "necessary or advisable in the interests of the United States," but the Director's exercise of discretion is still subject to judicial review. Without doubt, for example, the Director could not terminate Black employees simply because they are Black, female employees simply because they are female, or even blonde employees

---

**27.** One final CIA argument deserves only a short comment. The CIA argues that the statute's language, "[n]otwithstanding ... any other law," explicitly prevents the application of the APA. Although we agree that the APA is a "law," we find it plain that it is not the type of law to which the statute refers. The "law[s]" to which section 102(c) refers are those that would otherwise limit the Director's discretion to terminate CIA employees. The APA does not itself limit the Director's discretion. Instead, APA review merely ensures that the Director does not exceed the authority granted by section 102(c) and that the Director does not violate other limits—such as the Constitution—on his or her discretion.

**28.** *Heckler v. Chaney,* 470 U.S. 821, 105 S.Ct. 1649, 1659, 84 L.Ed.2d 714 (1985); *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 410, 91 S.Ct. 814, 820, 28 L.Ed.2d 136 (1971); *Adams v. Richardson,* 480 F.2d 1159, 1161 (D.C.Cir.1973) (en banc).

**29.** *Robbins v. Reagan,* 780 F.2d 37, 45 (D.C.Cir. 1985). While *Heckler v. Chaney,* 105 S.Ct. at 1656, applied a presumption of nonreviewability

to agency *enforcement discretion,* even the Government admits that no such presumption is applicable in the instant case. This case concerns agency action that involves coercive power over a federal employee and in an area traditionally subject to judicial scrutiny. *See Heckler v. Chaney,* 105 S.Ct. at 1656 (contrasting an agency's decision not to act with agency action such as that involved in the instant case); *Robbins,* 780 F.2d at 45 (limiting *Heckler's* presumption of nonreviewability to enforcement decisions).

**30.** *Heckler v. Chaney,* 105 S.Ct. at 1655; *see State of Florida v. United States Dep't of the Interior,* 768 F.2d 1248, 1255 (11th Cir.1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 1186, 89 L.Ed.2d 302 (1986).

**31.** *Citizens to Preserve Overton Park, Inc.,* 401 U.S. at 410, 91 S.Ct. at 820 (quoting S.Rep. No. 752, 79th Cong., 1st Sess. 26 (1945)).

**32.** *Robbins,* 780 F.2d at 45; *see also Local 1219, AFGE v. Donovan,* 683 F.2d 511, 515 (D.C.Cir. 1982).

**1518**

simply because they are blonde.[33] Indeed, Government counsel conceded at oral argument that the agency was not prepared to say that constitutional claims, or even claims that the Director acted in excess of his or her statutory authority, are precluded from review.

█ Additionally, section 102(c) requires that an employee be terminated *only* if the termination advances the interests of the United States. Although the court cannot second-guess the Director's decision that the termination of an employee is advisable in the interests of the United States, we must at least satisfy ourselves that the termination has *some* relationship to the interests of the United States. Thus, section 102(c) terminations cannot be a result of the mere whim of the Director. Otherwise, the words of section 102(c) would become nothing more than a magical incantation immunizing wholly irrational, vindictive or even blatantly unconstitutional action. Assuredly, therefore, the Director's discretion is not absolute.

---

**33.** Even in cases in which courts have held actions "committed to agency discretion by law," some review is still available to ensure that the agency has not violated other constitutional or statutory commands. *See Hondros v. United States Civil Service Comm'n,* 720 F.2d 278, 293 (3d Cir.1983) ("even those actions 'committed to agency discretion by law' are reviewable on grounds that the agency lacked jurisdiction, that the agency's decision was occasioned by 'impermissible influences,' or that the decision violates any constitutional, statutory, or regulatory command"); *WWHT, Inc. v. FCC,* 656 F.2d at 815 n. 15 ("In no event would a finding of non-reviewability on the ground that an action is committed to agency discretion preclude judicial review when constitutional violations have been alleged."); Sunstein, *supra* note 11, at 658 ("[I]f a plaintiff claims that an agency has taken constitutionally impermissible factors into account, there is always 'law to apply'—no matter what the governing statute may say. Similarly, if the plaintiff alleges that the agency's conduct has been based on factors that are irrelevant under the governing statute, there is always law to apply, even if the agency has especially broad discretion in weighing those factors that are statutorily relevant.").

**34.** 397 U.S. 159, 166, 90 S.Ct. 832, 837, 25 L.Ed.2d 192 (1970).

In similar circumstances, other courts have refused to preclude review. In *Barlow v. Collins,*[34] for example, the Supreme Court held that even a statute authorizing the Secretary of Agriculture "to prescribe such regulations as he may deem proper" did not preclude judicial review. In a justly celebrated decision by the late Judge Friendly, the Second Circuit held that the decision of the Immigration and Naturalization Service not to exercise its discretion to suspend an alien's deportation was subject to arbitrary and capricious review *even though the statute in question itself offered no standards for the exercise of that discretion.*[35] Even in a recent case challenging the Government's selective enforcement of a law—an action arguably subject to a presumption of nonreviewability—the Supreme Court did not refuse to review for First and Fifth Amendment violations.[36] Finally, this court in *Torpats v. McCone*[37] addressed the very statute at issue in this case and—rather than refuse review—upheld the termination of a CIA

---

**35.** *Wong Wing Hang v. INS,* 360 F.2d 715 (2d Cir.1966). Judge Friendly explained the possible grounds for a finding of an abuse of discretion:

Without essaying comprehensive definition, we think the denial of suspension to an eligible alien would be an abuse of discretion if it were made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis such as an invidious discrimination against a particular race or group, or, in Judge Learned Hand's words, on other "considerations that Congress would not have intended to make relevant."

*Id.* at 719 (quoting *United States ex rel. Kaloudis v. Shaughnessy,* 180 F.2d 489, 491 (2d Cir. 1950)). Clearly these same factors would also constitute an abuse of discretion in the context of section 102(c) terminations.

**36.** *See Wayte v. United States,* 470 U.S. 598, 105 S.Ct. 1524, 1531, 84 L.Ed.2d 547 (1985) (challenging selective prosecution of draft registration law violators).

**37.** 300 F.2d 914 (D.C.Cir.), *cert. denied,* 371 U.S. 886, 83 S.Ct. 182, 9 L.Ed.2d 121 (1962).

employee as "within the authority conferred upon [the Director] by Congress." [38]

We conclude therefore that there is "law to apply." The statute gives broad discretion to the Director, but that discretion is simply not absolute.

B. *The Alleged Breach of the CIA Regulations*

■ On the merits, Doe first claims that a CIA Headquarters regulation imposes independent limitations on the Director's discretion to terminate employees pursuant to section 102(c). Generally, an agency must follow its own regulations, and judicial review is available for claims that agency regulations have been violated.[39] At issue here is whether the particular CIA regulation cited by appellee indeed limits the CIA's discretion.

■ We conclude that the CIA regulation does not so limit the Director's discretion. The regulation lists ten circumstances in which employees may be separated from the CIA, the last of which is almost identical to section 102(c):

> OTHER TERMINATION IN THE INTERESTS OF THE AGENCY. In addition to paragraphs a through i, employees may be terminated if the Director of Central Intelligence determines it necessary and advisable in the interest of the Agency or for other reasons contributing to the efficiency of the Agency.[40]

The regulation also lists procedures that "[n]ormally" will govern separations from the CIA, but cautions that these procedures need not be followed for terminations made pursuant to section 102(c):

> [Procedures] should be followed insofar as practicable, but there may be circumstances of a case that make these procedures impractical or undesirable, and the case should be handled in a manner conforming to the circumstances. More-

over, to meet the responsibilities placed upon the Agency and pursuant to statutory authority, *any employee may be separated immediately and without regard to any suggested procedural steps when the Director of Central Intelligence considers it necessary or advisable in the interests of the United States.*[41]

This disclaimer is reiterated later in the regulation:

> In some other cases, the following modified procedures apply:
>
> . . . .
>
> (c) Pursuant to statutory authority, the Director of Central Intelligence may separate an employee directly when necessary or advisable in the interests of the United States.[42]

We cannot imagine how the CIA could have more plainly expressed its intent to protect the discretion granted it by section 102(c). Doe's arguments to the contrary are simply without merit. The District Court ruled that the exception for terminations necessary or advisable in the interests of the United States applies only when urgency prevents the application of procedural protections:

> While section 27m provides that an employee "may be separated immediately and without regard to any suggested procedural steps when the Director ... considers it necessary or advisable in the interest [sic] of the United States" the immediacy and urgency of Doe's employment status is belied by the fact that his voluntary disclosures were made in January 1982, but it was not until five months later—May 1982, that the Director decided to fire him.[43]

This reasoning cannot stand, however, because "immediacy" is not a requirement that must be satisfied before the proce-

---

38. *Id.* at 915.

39. *See Service v. Dulles,* 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957).

40. CIA Regulation HR 20–27(j), *reprinted in* J.A. 35.

41. *Id.* 20–27m (emphasis added).

42. *Id.* 20–27m(8).

43. *Doe v. Casey,* 601 F.Supp. 581, 587 n. 4 (D.D. C.1985).

dures otherwise provided by the regulations become inapplicable. Rather, if a termination is "necessary or advisable in the interests of the United States," the termination can be made "without regard to *any suggested procedural steps*" and, in addition, the termination *"may"* be immediate. The immediate separation discussed in the regulation is an optional course of action available to the Director that he or she need not exercise.

The cases cited by Doe and the District Court are equally inapposite. In *Ashton v. Civiletti,*[44] an FBI Handbook informed agency employees that they could "assume that [their] position[s] [are] secure, if [they] continue to do satisfactory work;" and the FBI Handbook contained no exceptions for particular types of terminations as found in the CIA regulations. The court in *Ashton* did, however, emphasize that—like the CIA—the FBI distinguished between probationary and nonprobationary employees:

> In the absence of any special definition [of probation], appellant could only be expected to comprehend it in its normal meaning—that he was required to serve an initial proving period in which his performance could be tested and, if his employer was dissatisfied, in which he could be fired without ceremony. A probationary period, of course, would be unnecessary if the employer could dismiss a non-probationary employee at any time and for any reason.[45]

Although the CIA also has a "probationary period," it—unlike the FBI—*does* give "probation" a "special definition" in its regulation. A termination during this period has its own set of procedures and standards.[46] This *same* regulation, however, explicitly exempts terminations that are "necessary or advisable in the interests of

the United States" from *any* procedural requirements.

Similarly, *Matlovich v. Secretary of the Air Force*[47] is not applicable. In that case, this court ordered the Air Force to explain the termination of a homosexual Air Force airman. The court noted, however, that unlike the CIA, the "Air Force regulation expressly contemplates that exceptions can be made to the general policy of separating homosexuals;"[48] it was because the regulation expressly contemplated such exceptions that we concluded that the Air Force must provide a reasoned explanation for not making such an exception in an individual case.[49] The CIA regulation quite simply includes no such explicit exception.

We conclude, therefore, that the CIA regulation provides no independent source of procedural or substantive protections. Doe must look to section 102(c) itself or to the Constitution.

### C. *Termination of Doe's Employment*

■ The APA provides the appropriate standard for our review of Doe's termination pursuant to section 102(c). We must uphold the Director's decision unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."[50] At the outset it is critical that we emphasize the broad discretion granted the Director of Central Intelligence by section 102(c). The Director is responsible for one of the most sensitive agencies in the federal government; the keen interest of foreign intelligence agencies in the inner workings of the CIA is obvious. Congress accordingly recognized the need for the Director to have broad power to terminate CIA personnel for even the slightest security risk. The necessity for judicial deference to the judgments of the Director is further highlighted by the

44. 613 F.2d 923 (D.C.Cir.1980).

45. *Id.* at 929.

46. *See* CIA Regulation HR 20–27(a); 20–27m(8)(b) ("In the case of separation during the trial period, the procedures of paragraph a are to be followed."), *supra* note 40.

47. 591 F.2d 852 (D.C.Cir.1978).

48. *Id.* at 855.

49. *Id.* at 859.

50. 5 U.S.C. § 706(2)(A) (1982).

difficult nature of the decisions the Director must make. Judgments about the security of the CIA require an expertise unique to those in the intelligence community. As the Supreme Court recently noted in *CIA v. Sims*,[51] "[t]he decisions of the Director, who must of course be familiar with 'the whole picture,' as judges are not, are worthy of great deference given the magnitude of the national security interests and potential risks at stake."[52] Moreover, our review must be circumspect because "[i]t is conceivable that the mere explanation of why information must be withheld can convey valuable information to a foreign intelligence agency."[53]

▪ We conclude, therefore, that although judicial review of the Director's judgments is not precluded, we must apply the arbitrary and capricious standard in the context of this statute which leaves the decision to terminate CIA employment largely to the expertise and judgment of the Director. As a practical matter, therefore, our main concerns will be the *arguable* infringement of constitutional rights and the possibility that the Director has acted in excess of statutory authority, rather than the wisdom of the termination itself.[54]

Unfortunately, there is great confusion as to precisely what the Director intended to do in this case. We see three possible explanations for the Director's action:

(1) The Director may have intended to invoke section 102(c) without giving any reasons at all for the termination of Doe's employment;

(2) The Director may have intended to terminate Doe as part of a ban against the employment of all homosexuals; or

(3) The Director may have dismissed Doe because *Doe's* homosexuality presented a security risk.

As we discuss below, the resolution of this case depends critically on which of these explanations is applicable. Because of the confusion surrounding the Director's reasoning, we must remand the case to the District Court for further proceedings.

1. *Invocation of Section 102(c) Without Giving Reasons*

It may be—albeit unlikely—that the Director terminated Doe's employment for reasons wholly unrelated to Doe's homosexuality. We strongly doubt that this is the case because the CIA displayed no concern about Doe's employment until it was made aware of Doe's homosexuality; and, as we read the record, the clear focus of the CIA's inquiry before the Director decided to terminate Doe's employment was Doe's homosexuality. Because the record is unclear on this point, however, we leave the task of deciding whether the Director fired Doe for other unstated reasons to the District Court.

▪ If the Director intends to invoke section 102(c) without giving any reasons at all, a plaintiff must point to something concrete in the record suggesting that section 102(c) is being used as a sham before a court requires the Director to explain his decision to fire the employee. The plaintiff must, for example, point to evidence of an impermissible basis—such as sex, race, hair color, etc.—for the termination. Given the sensitive nature of the CIA's mission, and the risk that merely explaining why information must be withheld "can convey valuable information to a foreign intelligence

---

51. 471 U.S. 159, 105 S.Ct. 1881, 85 L.Ed.2d 173 (1985).

52. *Id.* at 1893.

53. *Id.*

54. In cases involving challenges to agency failures to institute rulemaking we have similarly declined to find a preclusion of review, but have exercised only a narrow scope of review. *See WWHT, Inc. v. FCC,* 656 F.2d 807, 809 (D.C.Cir. 1981) ("[W]e hold that, except where there is evidence of a 'clear and convincing legislative intent to negate review,' ... an agency's denial of a rulemaking petition is subject to judicial review. However, we believe that the decision to institute rulemaking is one that is largely committed to the discretion of the agency, and that the scope of review of such a determination must, of necessity, be very narrow.") (quoting *Natural Resources Defense Council, Inc. v. SEC,* 606 F.2d 1031, 1043 (D.C.Cir.1979)).

**1522**

agency," [55] we cannot permit a "witchhunt" aimed at discovering the reasons for the invocation of section 102(c). Quite simply, we could endanger national security interests if we were to require the CIA to explain each and every decision to terminate the employment of an employee.

We must operate under a presumption that the CIA is acting lawfully and in good faith in any invocation of section 102(c), unless the plaintiff gives adequate reason to believe otherwise. Only if a plaintiff offers a basis for suspicion that the Director terminated the plaintiff's employment for an impermissible reason will we require the Director to justify his or her decision. In the instant case, Doe has not even alleged concrete evidence of an impermissible ground unrelated to his homosexuality for the invocation of section 102(c). Thus, we hold that if the Director intended to invoke section 102(c) without reasons in this case, there are no grounds to reverse the Director's decision to terminate Doe's employment and, correspondingly, no bases for requiring the Director to explain his exercise of discretion under section 102(c).

### 2. Bar Against All Homosexuals

Alternatively, the Director may have intended to terminate Doe's employment as part of a CIA policy barring the employment of all homosexuals. The record is somewhat confusing on this point. Doe was not immediately discharged by the CIA; instead, he underwent extensive polygraph examination. This suggests that his mere status as a homosexual was not the reason for his later discharge. Furthermore, Doe's counsel was informed by officials in the CIA General Counsel's Office that decisions to terminate homosexuals would be made on a case-by-case basis. On the other hand, however, Doe was told by several security officers that homosexuality violated CIA rules. Thus, it is unclear

to us whether Doe's termination reflects a policy of terminating the employment of all homosexuals. We will leave this issue for resolution by the District Court.

If the District Court concludes that the CIA intended to bar all homosexuals, there is an *arguable* claim that can be litigated. Although this circuit's decision in *Dronenburg v. Zech*, [56] and the Supreme Court's recent decision in *Bowers v. Hardwick*, [57] hold that homosexual *conduct* is not constitutionally protected, they did not reach the difficult issue of whether an agency of the federal government can discriminate against individuals merely because of sexual *orientation*. At the very least, the CIA would have to justify why such a ban on the employment of all homosexuals was "necessary or advisable in the interests of the United States."

### 3. Termination Because of Doe's Homosexuality

Finally, the Director may have dismissed Doe because *Doe's* homosexuality presented a security risk. Although we do not believe that this would present any colorable substantive constitutional claim, if this were the case Doe may have a claim that the CIA deprived him of his liberty interest in reputation without due process.

In *Board of Regents v. Roth*, [58] the Supreme Court concluded that a government employee's liberty interests are impaired when the government makes a charge against the employee that damages "his standing and associations in the community" or "impose[s] on him a stigma or other disability that foreclose[s] his freedom to take advantage of other employment opportunities." [59] An injury to reputation alone, however, is not sufficient to give rise to a colorable liberty interest claim. Instead, a court analyzing a claim of a deprivation of a liberty interest must

---

**55.** *Sims*, 105 S.Ct. at 1893.

**56.** 741 F.2d 1388 (D.C.Cir.1984).

**57.** —— U.S. ——, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986).

**58.** 408 U.S. 564 (1972).

**59.** *Id.* at 573.

satisfy itself that a plaintiff has met *two* requirements. First, the government must have altered the "status" of the employee in some tangible way by, for example, discharging the employee, foreclosing the employee's future employment opportunities, or reducing the employee's rank or pay.[60] Second, this change in "status" must be accompanied by injury to the employee's good name, reputation, honor or integrity, or by the imposition of a similar stigma.[61]

■ There is little question that the first requirement—a change in status—is satisfied in this case. The loss of government employment is the paradigmatic "status change" in liberty-interest jurisprudence.[62] Satisfaction of the second requirement is more problematic. In order for Doe to assert the deprivation of a liberty interest, he must establish that the CIA has stigmatized him and that the stigma "has hampered future employment prospects" or injured his good name.[63] If the CIA had merely declined to give Doe a security clearance for unspecified reasons, we doubt whether the second requirement would be satisfied. In *Molerio v. FBI*,[64] we held that the decision of the FBI not to hire an applicant because of security clearance problems did not violate the applicant's due process rights:

> To receive a "top secret" clearance is assuredly a badge of loyalty; but to be

denied it on *unspecified grounds* in no way implies disloyalty or any other repugnant characteristic—as is shown by the evidence in this case that the mere fact that one has relatives in a hostile country may be considered a basis for denial.[65]

Doe, however, was not denied a security clearance "on unspecified grounds." Instead, the CIA will inform Doe's future employers that he presents a security risk *because of his homosexuality*. Because Doe himself does not view homosexuality as stigmatizing—and indeed, admits that he is a homosexual—he would have no liberty interest claim if *all* homosexuals were banned from CIA employment.[66] If, on the other hand, the CIA terminated Doe because *his* homosexuality presented a unique security risk not necessarily presented by all other homosexuals, we must conclude that the statement is sufficiently stigmatizing to give rise to a colorable liberty interest claim. If the CIA alleges that something unique about Doe's sexual conduct makes him undesirable for sensitive government work, the inevitable result is that Doe is foreclosed from employment in the field in which he has been especially trained. As a practical matter, Doe will be unable to obtain employment whenever a security clearance is required.[67]

**60.** *See Paul v. Davis*, 424 U.S. 693, 711, 96 S.Ct. 1155, 1165, 47 L.Ed.2d 405 (1976); *Mosrie v. Barry*, 718 F.2d 1151, 1161 (D.C.Cir.1983). For purposes of a *liberty* interest claim, it is not relevant that the public employee's job did not constitute a property interest. *See Doe v. United States Dep't of Justice*, 753 F.2d 1092, 1106–07 (D.C.Cir.1985).

**61.** *Doe v. United States Dep't of Justice*, 753 F.2d at 1105.

**62.** *See, e.g., id.* at 1106–08; *Mosrie*, 718 F.2d at 1161–62.

**63.** *Doe v. United States Dep't of Justice*, 753 F.2d at 1111.

**64.** 749 F.2d 815 (D.C.Cir.1984).

**65.** *Id.* at 824 (emphasis added).

**66.** *See Beller v. Middendorf*, 632 F.2d 788, 806 (9th Cir.1980) (when "real stigma imposed by

the Navy's action ... is the charge of homosexuality," which plaintiffs admit, there is no deprivation of liberty), *cert. denied*, 452 U.S. 905, 101 S.Ct. 3030, 69 L.Ed.2d 405 (1981).

**67.** While it may be true that other agencies and private employers will make their own determination of Doe's security risk, as a practical matter, we find it inconceivable that other agencies would second-guess such a determination by the CIA. At the very least, the potential foreclosure of economic opportunities is as great as that found to violate liberty interests in recent cases in this circuit. *See, e.g., Doe v. United States Dep't of Justice*, 753 F.2d at 1112–13 & n. 24 (information in employee's file indicating that employee was terminated for unprofessional conduct and dishonesty gives rise to liberty claim); *Old Dominion Dairy Products, Inc. v. Secretary of Defense*, 631 F.2d 953, 962–66 (D.C. Cir.1980) ("lack of integrity" charge that was communicated to other government agencies gave rise to liberty interest claim); *see also*

■ Even if the CIA deprived Doe of his liberty interest in his reputation, however, our inquiry is not at an end. The due process clause requires that the CIA not deprive Doe of his liberty interest *without due process of law.* We must therefore determine whether Doe received the process he was due. Doe was entitled to an opportunity to refute the charges and "clear his name." [68] The sole purpose of this "name-clearing hearing" is to do just that—give the employee an opportunity to clear his or her name. This name-clearing hearing need not be formal; the fundamental requirement is that Doe have an opportunity to be heard in a meaningful manner.[69] As the Seventh Circuit explained,

> In its essence, a hearing demands that the person have the right to support his allegations by argument, however brief, and if necessary, by proof, however informal.[70]

■ We conclude that Doe was given a meaningful opportunity to contest any allegation that his homosexuality presented a security risk—indeed, a meaningful opportunity that Doe and his counsel vigorously pursued. Doe had notice that the CIA was seriously concerned about his homosexuality. The CIA furthermore permitted Doe to examine the polygraph officer's report, and to submit lengthy written arguments on his behalf. Finally, Doe makes no allegation that either the Office of Security or the Director of Central Intelligence were biased.[71] In the context of a very sensitive agency such as the CIA, we cannot say that the Constitution requires more.[72]

---

*White v. Thomas,* 660 F.2d 680, 684–85 (5th Cir.1981) (charge that employee lied on his employment application gave rise to liberty interest due process claim), *cert. denied,* 455 U.S. 1027, 102 S.Ct. 1731, 72 L.Ed.2d 148 (1982).

**68.** *Codd v. Velger,* 429 U.S. 624, 627, 97 S.Ct. 882, 883, 51 L.Ed.2d 92 (1977).

**69.** *Mathews v. Eldridge,* 424 U.S. 319, 333, 96 S.Ct. 893, 901, 47 L.Ed.2d 18 (1976).

**70.** *Endicott v. Huddleston,* 644 F.2d 1208, 1216 (7th Cir.1980).

**71.** *See, e.g., Staton v. Mayes,* 552 F.2d 908, 913–14 (10th Cir.) (finding potential due process violation because of biased decisionmaker),

---

### III. CONCLUSION

Section 102(c) terminations are subject to judicial review. Because the statute leaves the decision of whether an individual's employment should be terminated as "necessary or advisable in the interests of the United States" largely to the discretion of the Director of Central Intelligence, however, judicial review must be deferential. The District Court erred by showing insufficient deference to the judgment of the Director. However, because the record is unclear on certain critical points that may have a bearing on Doe's claims for relief, we remand this case for further proceedings consistent with this opinion.

*So ordered.*

GINSBURG, Circuit Judge, concurring:

The careful reader of the opinions in this case will find that the two sides part company widely only at the last step of the way. First, both sides agree that the "wisdom" of the Director's employment termination decisions is not for courts to judge. Majority Opinion at 1522; *see id.* at 1521–22 (court presumes Director "is acting lawfully and in good faith" unless plaintiff "point[s] to evidence of an impermissible basis—such as sex, race, hair color, etc.— for the termination"). Second, both sides also agree that there is, indeed, a "role" for the court to play. *See* Partial Dissent at 1533–34. The dissent, although more reservedly than the majority, recognizes that the court's review legitimately extends

---

*cert. denied,* 434 U.S. 907, 98 S.Ct. 309, 54 L.Ed.2d 195 (1977).

**72.** Similar informal procedures have been upheld. *See, e.g., Campbell v. Pierce County,* 741 F.2d 1342, 1345–46 (11th Cir.1984) (rejecting liberty interest due process claim when plaintiff had notice and the opportunity to rebut claims of insubordination and mishandling of funds), *cert. denied,* —— U.S. ——, 105 S.Ct. 1754, 84 L.Ed.2d 818 (1985); *Endicott,* 644 F.2d at 1216 (rejecting requirement that government call witnesses whom the employee's counsel could cross-examine).

to the question whether "the Director has acted in excess of statutory authority." Majority Opinion at 1521; *see* Partial Dissent at 1533 (acknowledging the court's legitimate function, when its review authority is invoked, "to ensure that the Director acted within the bounds of his statutory authority").

The majority, but apparently not the dissent, regards it as the province of the court to entertain arguable claims of constitutional rights. *See* Majority Opinion at 1521, 1522. While both sides would review to keep the Director within the bounds of ordinary legislation, the dissent, it seems, would not necessarily extend court review to the Director's compliance with the nation's highest law. I find the dissent's stopping point curious, and not persuasively explained. Whether a court may review at all, and how it should rule if it does review, of course, are discrete questions. *Cf. Johnson v. Robison*, 415 U.S. 361, 94 S.Ct. 1160, 39 L.Ed.2d 389 (1974) (statute precluding judicial review of Veterans' Administration decisions did not bar court consideration of constitutional claims—Court went on to decide merits against plaintiff).

BUCKLEY, Circuit Judge, concurring in part and dissenting in part:

I concur in sections II(B) and II(C)(3) of the majority opinion, which hold (a) that CIA regulations provide no procedural or substantive rights beyond those granted under section 102(c) of the National Security Act of 1947, 50 U.S.C. § 403(c) (1982); and (b) that as Doe has been accorded all the process that is his due, he has not been deprived of a liberty interest without due process of law. Nevertheless, because the majority ignores the obvious legislative intent in section 102(c) to shield the Director's employee termination decisions from judicial review, I must dissent from the balance of the opinion.

As the majority notes, there exists a strong presumption that agency actions are reviewable. *See, e.g., Block v. Community Nutrition Inst.*, 467 U.S. 340, 349, 104 S.Ct. 2450, 2456, 81 L.Ed.2d 270 (1984). Judicial review is unavailable, however,

> to the extent that—(1) statutes preclude judicial review; or (2) agency action is committed to agency discretion by law.

Administrative Procedure Act, 5 U.S.C. § 701(a) (1982). Disregarding Supreme Court case law and this court's own precedent, the majority overstates both the conclusiveness of the presumption of reviewability and the difficulty of establishing the section 701(a) exceptions. Furthermore, by ignoring the plain meaning and objectives of section 102(c), the majority manages to avoid what should be the obvious conclusion that that statute both precludes judicial review within the meaning of section 701(a)(1) and commits termination decisions to the nonreviewable discretion of the Director of the CIA ("Director") within the meaning of section 701(a)(2).

I. STATUTORY PRECLUSION

A. *The Standard for Finding Preclusion*

To support its holding that judicial review of a section 102(c) termination decision is not precluded by statute, the majority relies on cases such as *Dunlop v. Bachowski*, 421 U.S. 560, 567, 95 S.Ct. 1851, 1857, 44 L.Ed.2d 377 (1975), *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410, 91 S.Ct. 814, 820, 28 L.Ed.2d 136 (1971), and *Abbott Laboratories v. Gardner*, 387 U.S. 136, 140, 87 S.Ct. 1507, 1510, 18 L.Ed.2d 681 (1967), which speak of a "strong presumption" of reviewability, overcome only by "clear and convincing evidence" of congressional intent to preclude review. Since issuing these opinions, however, the Supreme Court has made significant refinements in its preclusion analysis which, in its reliance on the older precedents, the majority has failed to apply.

In *Block v. Community Nutrition Inst.*, 467 U.S. 340, 104 S.Ct. 2450, 81 L.Ed.2d 270 (1984), the Supreme Court reversed this court's holding that an agency action was subject to judicial review. In finding judicial review unavailable, the Court articulated three refinements of its earlier analy-

sis. First, the Court emphasized that the presumption of reviewability is rebuttable:

> The presumption favoring judicial review of administrative action is just that—a presumption. This presumption, like all presumptions used in interpreting statutes, may be overcome by ... reliable indicator[s] of congressional intent.

*Id.* at 349, 104 S.Ct. at 2456. Second, the Court indicated some permissible sources from which to infer such intent:

> Whether and to what extent a particular statute precludes judicial review is determined not only from its express language, but also from the structure of the statutory scheme, its objectives, its legislative history, and the nature of the administrative action involved.

*Id.* at 345, 104 S.Ct. at 2454. Finally, the Court described the evidentiary standard to be applied in determining the existence of a congressional intent to preclude review:

> In the context of preclusion analysis, the "clear and convincing evidence" standard is not a rigid evidentiary test but a useful remainder to courts that, where substantial doubt about the congressional intent exists, the general presumption favoring judicial review of administrative action is controlling.

*Id.* at 351, 104 S.Ct. at 2457. This presumption is overcome, however,

> whenever the congressional intent to preclude judicial review is fairly discernible in the statutory scheme.

*Id.* (citations omitted).

Subsequent Supreme Court cases have reaffirmed the *Block* analysis. *See Lindahl v. Office of Personnel Management*, 470 U.S. 768, 105 S.Ct. 1620, 1627, 84 L.Ed.2d 674 (1985) ("[T]he 'clear and convincing evidence' standard has never turned on a talismanic test." Rather, preclusion may be found in a statute's "express language, ... the structure of the statutory scheme, its objectives, its legislative history, and the nature of the administrative action involved."); *Bowen v. Michigan Academy of Family Physicians*, — U.S. —, 106 S.Ct. 2133, 2137, 90 L.Ed.2d 623 (1986).

Thus, although the Director's termination of Doe pursuant to section 102(c) is presumptively reviewable, this presumption is rebutted if the congressional intent to preclude review is "fairly discernible" from the face of the statute, the statutory scheme, the statute's objectives, the legislative history, or from the nature of the administrative action here involved. The demonstration of this congressional intent must be "clear and convincing," but not in a strict evidentiary sense; rather, the presumption comes into play "where substantial doubt" about that intent exists. In essence, the teaching of *Block* and subsequent cases is that the courts should not be hostile to congressional preclusion of judicial review of particular administrative actions, but should conduct an objective assessment of all relevant sources in order to determine what it is that Congress in fact intended.

## B. *The Standard Applied By The Majority*

Notwithstanding the straightforward inquiry into congressional intent espoused in *Block*, the majority extracts three principles from Supreme Court precedent that serve to accentuate the difficulty of establishing preclusion.

The majority first requires that congressional intent to preclude judicial review be established by "clear and convincing evidence." (Majority Opinion at 1514). While conceding *Block's* holding that this is "not a rigid evidentiary test," the majority nevertheless manages to add a little starch to that case's holding. The majority cites *Block* in support of the proposition that the congressional intent to preclude review must *"at the very least, ... be 'fairly discernible' in the detail of the legislative scheme." Id.* at 1515 (emphasis added). In fact, in *Block*, the Supreme Court went no further than to hold that a sufficiently "clear and convincing" showing is made *"whenever* the congressional intent to preclude judicial review is 'fairly discernible in the statutory scheme,'" 467 U.S. at 351, 104 S.Ct. at 2457 (emphasis added).

The majority's second principle states that "when the statute at issue specifies a standard that at least purports to limit agency discretion ..., this is highly probative evidence that Congress did not intend to preclude judicial review." (Majority Opinion at 1515). In support of this proposition, the majority cites *Southern Ry. v. Seaboard Allied Milling Corp.*, 442 U.S. 444, 455–56, 94 S.Ct. 2388, 2394–95, 60 L.Ed.2d 1017 (1979), in which the Supreme Court held an Interstate Commerce Commission decision nonreviewable, relying in part on the fact that the statute authorizing the decision "is silent on what factors should guide the Commission's decision." The problem here is that while a lack of statutory standards may well support an inference of nonreviewability, this hardly supports the inverse proposition that the presence of standards implies reviewability. Not all standards, after all, demand, or are capable of, judicial application.

As its third principle, the majority asserts that congressional intent to preclude judicial review may be inferred from the statutory scheme "only in a very limited category of cases involving uniquely complex or otherwise delicately balanced statutory schemes." (Majority Opinion at 1515). While it is true that in *Block* the Supreme Court relied on the details of the complex statutory scheme to infer a congressional intent to preclude review, 467 U.S. at 349, 104 S.Ct. at 2456, the Court has never intimated that a simpler statutory scheme would not support the same inference. In any case, the majority's insistence on complexity or delicacy of balance simply obscures the fact that the statutory scheme is but one of several elements identified by the Court in *Block* from which congressional intent might be inferred.

Having defined its own restrictive standards for finding statutory preclusion, the majority has little difficulty in ignoring the clear indications that Congress intended section 102(c) decisions to be nonreviewable.

C. *Indicators of Congressional Intent to Preclude Review Of Section 102(c) Termination Decisions*

1. The Statutory Language

On its face, section 102(c) clearly indicates a congressional intent to prohibit judicial review. The relevant portion of section 102(c) provides:

> Notwithstanding the provisions of section 7501 of title 5, or the provisions of any other law, the Director of Central Intelligence may, in his discretion, terminate the employment of any officer or employee of the Agency whenever he shall deem such termination necessary or advisable in the interests of the United States.

As demonstrated below, the "notwithstanding" clause provides "clear and convincing" evidence of the congressional intention to prohibit judicial review.

Section 102(c) was enacted at a time when federal personnel actions were not subject to judicial review. *United States v. Testan*, 424 U.S. 392, 406, 96 S.Ct. 948, 957, 47 L.Ed.2d 114 (1976). Congress, however, had adopted the Lloyd-LaFollette Act granting federal employees limited employment and procedural protections. 5 U.S.C. § 652 (1964), ch. 389, § 6, 37 Stat. 539, 555 (1912); *recodified as* 5 U.S.C. § 7501, Act of Sept. 6, 1966, Pub.L. No. 89–554, 80 Stat. 378, 527–28 (1966); *subsequently replaced by* 5 U.S.C. § 7501 *et seq.* (1980), Civil Service Reform Act of 1978, Pub.L. No. 95–454, 92 Stat. 1111, 1134 *et seq.* (1978). Under that Act, a federal employee could be removed only "for such cause as will promote the efficiency of [the] service," and he was granted the right to receive written notice of any charges against him, to file a written answer to those charges, and to receive a prompt written decision in response to that answer. Any further procedures, such as examination of witnesses, trial, or hearing were available only at the discretion of the agency official seeking the employee's removal. With the adoption of section 102(c), CIA employees were stripped of even these limited rights and became subject to summary termination

without a statement of reasons or opportunity to protest.

The majority nevertheless ignores section 102(c)'s elimination of the procedural protections of the Lloyd-LaFollette Act and focuses instead on the substantive provision prohibiting the dismissal of an employee "except for such cause as will promote the efficiency of the service." As a result, the majority is able to dismiss the elimination of Lloyd-LaFollette protections as "merely replac[ing] one set of standards—the more rigorous efficiency standards ... —with a new, more relaxed standard: that the termination be 'necessary or advisable in the interests of the United States.'" (Majority Opinion at 1516). Thus, argues the majority, the resulting expansion in the Director's discretion does not imply a preclusion of judicial review. *Id.*

The essential flaw in the majority's reasoning is its failure to recognize that the Director's termination decisions are insulated by section 102(c) from the procedural as well as the substantive provisions of the Lloyd-LaFollette Act. Thus, it finds itself in the untenable position of insisting that terminated CIA employees retain the right to judicial review even though Congress has stripped them of the minimal procedural rights of a statement of charges and a chance to respond.

The majority's holding that section 102(c) does not preclude judicial review relies significantly on its conclusion that the section "provides a standard" that constrains the Director's discretion. As discussed in section II(A) below, the majority arrives at this conclusion by misreading section 102(c) to require that the discharge of a particular employee actually be in the national interest. All that the statute prescribes, however, is that the Director *deem* it to be. Thus, the majority fails to draw the necessary distinction between judicial confirmation of the Director's *purpose* in terminating an employee (he deems it in the national interest) and a review of the *correctness* of the belief on which he acts. While a court may satisfy itself as to the former, it may not inquire into the latter. This clear distinction is underscored in *Service v. Dulles*, 235 F.2d 215 (D.C.Cir.1956), which deals with Department of State Appropriations Act, 1952, ch. 533, § 103, 65 Stat. 575, 581 (1951) (expired at the close of fiscal year 1952), a statute essentially identical to section 102(c), to wit:

> Notwithstanding the provisions of [the Lloyd-LaFollette Act], or the provisions of any other law, the Secretary of State may, in his absolute discretion, ... terminate the employment of any officer or employee of the Department of State or of the Foreign Service of the United States whenever he shall deem such termination necessary or advisable in the interests of the United States.

*Id.* at 216 n. 1. In construing the statute, this court cited with approval the following excerpt from the district court's "well-expressed" opinion:

> This Court cannot, of course, review the correctness of the former Secretary of State's determination. Its function is limited to determining whether any procedural requirement of the statute was violated in plaintiff's discharge.

> Under [§ 103 of the Appropriations Act] there was one procedural requirement: that the Secretary of State must determine in his discretion that the termination of plaintiff's employment was necessary or advisable in the interests of the United States.

*Id.* at 218. The court found that this requirement had been satisfied, as evidenced by an affidavit by the Secretary of State stating he had discharged the employee in the exercise of the authority vested in him, *inter alia*, by section 103 of Public Law 188, and it affirmed the lower court's grant of summary judgment for the government.

The Supreme Court subsequently reversed, *Service v. Dulles*, 354 U.S. 363, 388, 77 S.Ct. 1152, 1165, 1 L.Ed.2d 1403 (1956), but only because the Secretary had not complied with his own departmental regulations which imposed more exacting procedures for termination than were required by statute. The Court specifically noted that under the statute "the Secretary

was not obligated to impose upon himself these more rigorous substantive and procedural standards." 354 U.S. at 388, 77 S.Ct. at 1165. Thus, this court's holding in *Service* clearly applies to section 102(c), and dictates a finding of statutory preclusion as to any inquiry beyond the Director's satisfaction of the "procedural requirement" that he deems the termination to be in the national interest.

### 2. Further Indications of Congressional Intent to Preclude Review

In *Block*, the Supreme Court held that the congressional intent to preclude judicial review within the meaning of section 701(a)(1) could be ascertained not only from the express language of the statute, but also from the statutory objectives and the nature of the administrative action involved. 467 U.S. at 345, 104 S.Ct. at 2454. In the instant case, these factors clearly confirm a congressional intent to preclude review.

Section 102(c) authorizes the Director to terminate an employee whenever he deems such action in the interests of the United States, unencumbered by the requirements of the Lloyd-LaFollette Act. Absent this authorization, the Director could only terminate an employee "for such cause as will promote the efficiency of [the] service," and would be required to give such an employee a written copy of the charges against him and an opportunity to answer those charges. The obvious purpose of section 102(c) is to allow the Director to terminate employees unimpeded by these substantive and procedural requirements. Subjecting the Director's decisions to judicial scrutiny flies in the face of this clear legislative purpose.

This conclusion is supported by the nature of the administrative action involved. The summary dismissal authority granted to the Director by the National Security Act of 1947 is a natural and necessary function of the extraordinary sensitivity that surrounds every aspect of our national security operations. The abiding concern for the ability of sensitive agencies to maintain absolute control over personnel is reflected in a 1964 Senate committee report commenting on the proposed grant to the Secretary of Defense of "summary power ... to terminate the employment of any employee" of the National Security Agency upon a determination that the exercise of this power was "in the interests of the United States." Citing the fact that identical authority had earlier been granted the Director of the CIA, the report explained:

> The responsibilities assigned to the National Security Agency are so great, and the consequences of error so devastating, that authority to deviate from [proposed procedures providing federal employees with the benefit of conventional procedural protections] should be granted to this agency.

S.Rep. No. 926, 88th Cong., 2d Sess., 2 (1964), U.S.Code Cong. & Admin.News 1964, pp. 2114, 2115. It is of course true, as the majority points out, that a Congress has no authority to interpret the meaning of statutes enacted by its predecessors. The passage I have quoted, however, sheds light on the nature of the national security concerns with which successive Congresses have been called upon to deal.

No agency is more sensitive, and few so important to our national safety, as the CIA. As the Supreme Court has pointed out, its effectiveness has been "thought by every President since Franklin D. Roosevelt to be essential to the security of the United States and—in a sense—the free world." *Snepp v. United States*, 444 U.S. 507, 512 n. 7, 100 S.Ct. 763, 767 n. 7, 62 L.Ed.2d 704 (1980). To safeguard the agency's effectiveness, Congress has given "the Director of Central Intelligence broad power to protect the secrecy and integrity of the intelligence process. The reasons are too obvious to call for enlarged discussion; without such protections the agency would be virtually impotent." *CIA v. Sims*, 471 U.S. 159, 105 S.Ct. 1881, 1888, 85 L.Ed.2d 173 (1985). Judicial intrusion into the CIA's personnel actions can threaten to expose the agency's inner processes and compromise its integrity.

[T]he very nature of the intelligence apparatus of any country is to try to find out the concerns of others; bits and pieces of data may aid in piecing together bits of other information even when the individual piece is not of obvious importance in itself.... [W]hat may seem trivial to the uninformed, may appear of great moment to one who has a broad view of the scene and may put the questioned item of information in its proper context.... It is conceivable that the mere explanation of why information must be withheld can convey valuable information to a foreign intelligence agency.... And it is the responsibility of the Director of Central Intelligence, not that of the judiciary, to weigh the variety of complex and subtle factors in determining whether disclosure of information may lead to an unacceptable risk of compromising the Agency's intelligence gathering process.

*Id.* at 1892–94 (citations omitted). These imperative needs explain why Congress, in 1947, provided the Director with summary power to terminate employees as to whom he had any question while, at the same time, stripping those employees of the only protections they then enjoyed under federal law.

In sum, the explicit language of section 102(c), the clear statutory objectives, and the nature of the administrative action here involved all lead to the inescapable conclusion that Congress intended to preclude judicial review of the Director's exercise of his authority under that section.

## II.  COMMITMENT TO AGENCY DISCRETION

Even absent these clear and convincing indications of congressional intent, the court should nevertheless hold the Director's decision shielded from judicial review because section 102(c) commits this decision to the Director's discretion within the meaning of section 701(a)(2). The majority avoids this conclusion first by reading non-existent constraints into the section 102(c) grant of termination authority, and

then by ignoring this court's precedents sanctioning a less restrictive standard for finding a commitment to agency discretion.

### A.  *The Majority's Overstatement of the Constraints Section 102(c) Imposes on the Director's Exercise of Discretion*

In order to support its holding that section 701(a)(2) does not prohibit judicial review of the Director's exercise of authority under section 102(c), the majority overstates the constraints the latter imposes on the Director's discretion.

In the first place, the majority misstates section 102(c) by asserting that it establishes a standard requiring "that terminations be 'necessary or advisable in the interests of the United States.'" (Majority Opinion at 1517). From this misreading, the majority concludes that "section 102(c) requires that an employee be terminated *only* if the termination advances the interests of the United States." (Majority Opinion at 1518) (emphasis in the original). Thus, the door is opened to at least limited scrutiny into the merits of the Director's decision. The statute, however, does not read that way. Far from requiring that a particular termination in fact advance the national interest, section 102(c) goes no further than to authorize the Director *"in his discretion"* to terminate any employee "whenever *he* shall deem such termination necessary or advisable in the interests of the United States." (emphasis added). Thus the operative requirement is that the Director *believe* that the termination safeguards the interests of the United States and not (as the majority suggests) that it do so in fact.

Moreover, the statutory language cannot be read to authorize a court to inquire into the reasons for the Director's decision to terminate an employee because that decision is delegated to his discretion alone. As this court held in *Service v. Dulles, supra,* the judicial function is limited to a determination that the statute's "procedural requirements" have been met; namely, that the decision to terminate was in fact based on the *Director's* assessment of the

national interest. Beyond that, we cannot inquire.

One obvious purpose of section 102(c) is to allow the Director to act upon unsubstantiated impressions "when he shall deem" it in the national interest to do so. This represents, of course, an unusually broad delegation of authority. It was, however, the judgment of Congress that the Director should have that latitude, and it is not for this court to second-guess that judgment.

B. *The Majority's Failure to Apply this Court's Precedents Regarding the Standard for Finding Commitment to Agency Discretion Within the Meaning of Section 701(a)(2)*

Based on its finding that section 102(c) establishes a standard that constrains the Director's exercise of his discretion in terminating employees, the majority holds that the Director's decisions are judicially reviewable. This holding is premised on the notion that the "committed to agency discretion" exception applies *only* when "a court would have no meaningful standard" to apply (Majority Opinion at 1517); this notion, however, applies too narrow a reading of the Supreme Court's interpretation of section 701(a)(2), and directly contravenes this court's own precedents.

In support of the proposition that section 701(a)(2) applies only where there is "no law to apply" (Majority Opinion at 14), the majority cites *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. at 410, 91 S.Ct. at 821, and *Heckler v. Chaney*, 470 U.S. 821, 105 S.Ct. 1649, 1655, 84 L.Ed.2d 714 (1985). In those cases, however, the Supreme Court held only that section 701(a)(2) "is a very narrow exception" and that it is "applicable in those rare instances where statutes are drawn in such broad terms that in a given case there is no law to apply," or so drawn that "a court would have no meaningful standard against which to judge the agency's exercise of discretion." Nowhere does the Court state that this exception applies *only* in those cases.

The majority simply ignores this court's cases holding that section 701(a)(2) is evoked not only by the absence of applicable standards, but also by certain pragmatic considerations. In *Natural Resources Defense Council, Inc. v. SEC*, 606 F.2d 1031, 1043–44 (D.C.Cir.1979), this court held that the application of section 701(a)(2)

necessarily turns on pragmatic considerations as to whether an agency determination is the proper subject of judicial review.... In making this determination, we ... evaluate the relevance of three particularly important factors: the need for judicial supervision to safeguard the interests of the plaintiffs; the impact of review on the effectiveness of the agency in carrying out its congressionally assigned role; and the appropriateness of the issues raised for judicial review.... Finally, we inquire whether the considerations in favor of nonreviewability thus identified are sufficiently compelling to rebut the strong presumption of judicial review.

*Accord, Local 1219, AFGE v. Donovan*, 683 F.2d 511, 515 (D.C.Cir.1982) (Section 701(a)(2) "shields from review only those matters for which a 'fair appraisal of the legislative scheme, including a weighing of practical and policy implications of reviewability, persuasively indicates that judicial review should be circumscribed.'" (citation omitted)).

An assessment of the "pragmatic considerations" in the instant case, including "the impact of review on the effectiveness of the agency in carrying out its congressionally assigned role," clearly weighs against judicial review of the Director's section 102(c) decisions.

As the Supreme Court observed when dealing with a different section of the National Security Act of 1947:

The decisions of the Director, who must of course be familiar with "the whole picture," as judges are not, are worthy of great deference given the magnitude of the national security interests and potential risks at stake. It is conceivable that the mere explanation of why information

must be withheld can convey valuable information to a foreign intelligence agency.

*CIA v. Sims,* 105 S.Ct. at 1893. Here, of course, we are dealing not with a question of deference but of judicial competence. To intrude however deferentially into the Director's most sensitive personnel decisions entails the inevitable risk of unwittingly compromising national intelligence operations through the forced disclosure of information whose possible significance a court is not capable of assessing.

Whether or not such a danger exists in this particular case, the majority would establish a precedent that would force the Director now or in the future to risk the public airing of agency policies and concerns as well as the particular information upon which a specific termination decision is based. This would tend to compromise the CIA's vital, congressionally-mandated functions. These pragmatic considerations "are sufficiently compelling to rebut the strong presumption of judicial review." *Natural Resources Defense Council,* 606 F.2d at 1044.*

Even accepting, for the sake of argument, the majority's narrow position that section 701(a)(2) applies only when there is "no law to apply," judicial review is nevertheless precluded. Section 102(c) represents one of those "very narrow exceptions" where "there is no law to apply." It is in fact drawn in such a manner that "a court would have no meaningful standard against which to judge" the Director's exercise of his statutory discretion. It bears repeating that the operative standard here is not whether the termination of a particular employee serves the national interest

(as the majority maintains), but whether the Director believes it does. In the murky world in which the CIA must operate, one deals as often as not with intuitions as well as with provable facts, and a judge's perception of the national interest could be light years away from that of the Director called upon to make the critical judgments in the discharge of his special responsibilities. Given the nature of the discretion the Director is required to exercise, where is the law to be applied, where the meaningful standard against which any judge can take the measure of his performance?

It is noteworthy that in not a single case cited by the majority in support of judicial review of the exercise of agency discretion did the challenged decision involve considerations of national security: *e.g., Citizens to Preserve Overton Park* (highway planning); *Robbins v. Reagan,* 780 F.2d 37 (D.C.Cir.1985) (shelter for the homeless); *Local 1219, AFGE v. Donovan,* 683 F.2d 511 (D.C.Cir.1982) (settlement agreement between the Department of Labor and a federal employees' union resolving charges of unfair election procedures); *WWHT, Inc. v. FCC,* 656 F.2d 807 (D.C.Cir.1981) (FCC denial of rulemaking petition); *Adams v. Richardson,* 480 F.2d 1159 (D.C.Cir. 1973) (en banc) (school desegregation); *State of Fla. v. United States Dep't of Interior,* 768 F.2d 1248 (11th Cir.1985), cert. denied, —— U.S. ——, 106 S.Ct. 1186, 89 L.Ed.2d 302 (1986) (Government acquisition of land to be held in trust for Indian tribe); *Wong Wing Hang v. INS,* 360 F.2d 715 (2d Cir.1966) (denial of application for suspension of deportation). Nor does a single case relied upon by the majority involve a situation where judicial review

---

* In support of its position that such pragmatic concerns need not be considered, and that the presence of a judicially manageable standard is the only issue relevant to the applicability of section 701(a)(2), the majority cites two cases from this court, *Adams v. Richardson,* 480 F.2d 1159 (D.C.Cir.1973) (en banc), and *Robbins v. Reagan,* 780 F.2d 37 (D.C.Cir.1985). These cases, however, are both distinguishable. Neither case involved an agency with a sensitive, national security-related mission, and in neither did judicial review pose the threat of disrupting

"the effectiveness of the agency in carrying out its congressionally assigned role." *Natural Resources Defense Council,* 606 F.2d at 1044. In fact, in both cases the court emphasized that its scrutiny would not interfere with agency functioning. 480 F.2d at 1162; 780 F.2d at 47.

The majority also cites *Local 1219, AFGE v. Donovan,* but far from supporting the majority's narrow reading of section 701(a)(2), that case directs the court to weigh the "practical and policy implications of reviewability." 683 F.2d at 515.

could pose the threat of disrupting "the effectiveness of the agency in carrying out its congressionally assigned role."

Because judicial review would tend to be sufficiently disruptive of the CIA's mission to rebut the presumption of reviewability, and because section 102(c) imposes no substantive constraints on the Director's exercise of his discretion and provides no meaningful standard for a court to apply, the Director's action is committed to his discretion within the meaning of section 701(a)(2) and is not subject to review.

III. ARGUABLE CONSTITUTIONAL RIGHTS

Having decided that section 102(c) does not preclude judicial inquiry into the Director's rationale for terminating an employee, the majority proceeds to explore alternative explanations for the Director's action in search of one that might constitute an *"arguable* infringement of constitutional rights" (Majority Opinion at 1521) (emphasis in the original). It found one (at least to its own satisfaction) in the possibility that the termination of Doe might have been "part of a ban against the employment of all homosexuals." *See* Majority Opinion at 1522–1523. While the majority concedes that the Supreme Court in *Bowers v. Harwick,* —— U.S. ——, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986), and this court in *Dronenburg v. Zech,* 741 F.2d 1388 (D.C. Cir.1984), have held that homosexual conduct is not constitutionally protected, it argues that these courts did not reach "the difficult issue of whether an agency of the federal government can discriminate against individuals merely because of sexual *orientation"* (Majority Opinion at 1522) (emphasis in the original).

Accordingly, the majority remands the case with instructions to the district court (as I understand them) to determine whether the CIA has a policy of terminating the employment of all homosexuals. Presumably, if such a policy were found, the issue would then arise whether homosexual orientation, as opposed to homosexual conduct, is constitutionally protected. (Majority Opinion at 1522–1523).

At this point it is well to remind ourselves of what the Supreme Court described, in *Sims,* as "the harsh realities of the present day." 105 S.Ct. at 1891. In few areas of our national life can a single mistake lead to such calamitous consequences as in our national security services; in few areas are those in responsibility under such a heavy obligation to avoid the slightest identifiable risk. As one who shares the belief that the Constitution is not a suicide pact, I cannot agree that an intelligence agency is even arguably precluded from adopting a policy banning the employment of members of any class which the Director might deem to be more susceptible to blackmail than the average. Nor may we assume (as the majority apparently does) that every constitutional inquiry will suffice to override a congressional decision to preclude judicial review for reasons of national security. Be that as it may, neither that issue nor the majority's hypothetical is before us, and the plain meaning of section 102(c) precludes the kind of judicial fishing expedition on which the majority proposes to dispatch the district court.

IV. REMAINING JUDICIAL ROLE

Judicial review of the Director's section 102(c) decision to terminate Doe's employment is unavailable under either section 701(a)(1) or section 701(a)(2). The only legitimate role remaining for this court is to ensure that the Director acted within the bounds of his statutory authority, *i.e.,* that his decision to terminate Doe's employment was in fact based upon *his* appraisal that "such termination [was] necessary or advisable in the interests of the United States." This is precisely the role to which this court limited itself in finding that the Director had acted within his authority in *Torpats v. McCone,* 300 F.2d 914 (D.C.Cir.), *cert. denied,* 371 U.S. 886, 83 S.Ct. 182, 9 L.Ed.2d 121 (1962). *See also Service v. Dulles,* 235 F.2d 215 (D.C.Cir.1956).

In the instant case, as in *Torpats,* the record contains the Director's sworn statement that "[a]fter careful consideration of

the matter, [the Director] determined that the termination of Mr. Doe's employment was necessary and advisable in the interests of the United States." This statement suffices to require our holding "that the Director acted within the authority conferred upon him by Congress...." 300 F.2d at 915.

As this comprises the extent of the legitimate inquiry, this case should be remanded to the district court with instructions to dismiss.